# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of the Dependency of<br><br>D.L.B.,<br>D.O.B: 11/01/08,<br>     Minor child.<br><br>STATE OF WASHINGTON,<br>DEPARTMENT OF SOCIAL AND<br>HEALTH SERVICES,<br><br>     Respondent,<br><br>   v.<br><br>EDELYN SAINT-LOUIS,<br><br>     Appellant. | No. 72421-5-I<br><br>DIVISION ONE<br><br>PUBLISHED OPINION<br><br><br><br><br><br><br>FILED: July 13, 2015 |

TRICKEY, J. — In 2013, the legislature amended the Juvenile Court Act, chapter 13.34 RCW, to ensure that the rights of incarcerated parents are protected throughout various stages of the dependency and termination process. One of these amendments is codified in RCW 13.34.180(1)(f), the amended language of which states that "[i]f the parent is incarcerated," the trial court must consider several factors before terminating the parent-child relationship. Here, the mother was not incarcerated at the time of the termination hearing but was incarcerated for numerous months during the dependency. She contends that the order terminating her parental rights must be reversed because the trial court failed to consider the amended factors set forth in RCW 13.34.180(1)(f). We disagree and hold that the plain meaning of RCW 13.34.180(1)(f), as gleaned from its language and surrounding statutes, supports the conclusion that the amended factors apply only when the parent is incarcerated at the time of the termination hearing. Accordingly, we reject the mother's contention, as well as others she raises on appeal,

and affirm the trial court's order terminating her parental rights.

FACTS[1]

D.L.B. was born on November 1, 2008, to Edelyn Saint-Louis. The father is not a party to this termination proceeding.[2]

Since an early age, D.L.B. was exposed to domestic violence while in his mother's care. In 2009, the father threw D.L.B. at Saint-Louis and then struck her in the head. After this incident, Saint-Louis obtained a permanent no-contact order against the father.

A few years later, when D.L.B. was approximately two years old, Saint-Louis and D.L.B. moved in with the father's sister in Chicago for a few months. The father followed them to Chicago shortly thereafter, and would visit the house often. He would frequently harass and assault Saint-Louis. On at least one occasion, D.L.B. witnessed a physical altercation between Saint-Louis and the father. The police arrested the father three times during the three and a half months they resided in Chicago.

Saint-Louis and D.L.B. returned to Seattle. In early 2012, the Department of Social and Health Services (Department) received reports concerning domestic violence between Saint-Louis and her boyfriend at the time. The police had been called to Saint-Louis's residence on multiple occasions to investigate. On February 8, 2012, the police arrested Saint-Louis for leaving D.L.B. unattended for several hours. D.L.B. was taken

---

[1] Edelyn Saint-Louis assigns error to a number of the trial court's findings. However, she fails to devote argument to several of these claimed errors in her brief. The assignments of error are therefore waived. Cowiche Canyon Conservancy v. Bosley, 118 Wn.2d 801, 809, 828 P.2d 549 (1992). Saint-Louis also challenges several of the court's findings of fact in footnotes in her opening brief. We need not address arguments raised in footnotes. State v. Johnson, 69 Wn. App. 189, 194 n.4, 847 P.2d 960 (1993). In any event, a review of the record leads to the conclusion that the challenged findings are either supported by the record or were not material to the court's decision.

[2] The father's parental rights were terminated on May 16, 2014, by order of default. This appeal concerns only the termination of Saint-Louis's parental rights.

into protective custody.

On March 8, 2012, the Department filed a dependency petition on D.L.B.'s behalf. On May 11, 2012, D.L.B. was declared dependent as to both parents. The trial court required Saint-Louis to complete the following services: (1) random urinalysis (UA) testing two times per week; (2) a psychological evaluation with parenting component and compliance with recommended treatment; and (3) a domestic violence support group.

In July 2012, the Department referred Saint-Louis to Dr. Steve Tutty for a psychological and parenting evaluation. Saint-Louis completed the evaluation in October 2012. Dr. Tutty observed a positive bond between Saint-Louis and D.L.B. However, he found that Saint-Louis presented with "a myriad of risk factors that threaten the safety and well-being of [D.L.B.]"[3] He opined that Saint-Louis's "presentation, testing outcomes, and clinical/CPS history support psychological challenges best characterized by bipolar illness, polysubstance abuse, panic disorder, executive functioning deficits, learning disabilities, and histrionic traits."[4]

Dr. Tutty recommended against reunification of Saint-Louis with D.L.B. He determined that Saint-Louis's prognosis for maintaining the safety and welfare of D.L.B. was poor at the time of the evaluation and in the foreseeable future. Dr. Tutty concluded that it was highly unlikely that Saint-Louis would be able to remediate her parental deficits within the timeframe allowed for the Department to establish permanency. He nevertheless recommended she complete the following services within six months of the November 2012 evaluation: (1) drug and alcohol evaluation and follow-up with all recommendations; (2) medical consultation to explore additional psychotropic

---

[3] Exhibit (Ex.) 16 at 13.
[4] Ex. 16 at 13.

medications to target her mental health issues of bipolar illness, panic disorder, and executive functioning deficits; (3) participation in the Incredible Years parent education program; (4) monitored visitations about once a week; (5) participation in a domestic violence support group; and (6) work with her social worker in obtaining suitable housing and employment options.

D.L.B. was referred to the Foster Care Assessment Program (FCAP) for a reunification assessment. In the FCAP evaluator's written report, dated December 12, 2012, the evaluator recommended against reunification. She recommended Saint-Louis enroll in the Incredible Years parent education program "sooner rather than later."[5]

On November 5, 2012, Saint-Louis enrolled in a 30-day in-patient chemical dependency treatment program to address her dependence on alcohol, cannabis, and cocaine. She successfully completed that program and subsequently enrolled in an out-patient program in December 18, 2012. She completed that program in April 2013. Saint-Louis's UAs remained clean until May 2013, when she tested positive for alcohol during a random UA test. Her case worker recommended she participate in a relapse prevention program. Saint-Louis was unable to begin classes until a week before the termination trial in July 2014.

Following a dependency review hearing on May 30, 2013, the trial court found that Saint-Louis was in compliance with all court-ordered services except that she had missed five random UA tests since March 2013 and had not attended parent education classes. The trial court added another service to be completed by Saint-Louis: participation in mental health counseling.

---

[5] Ex. 17 at 10.

4

In July 2013, Saint-Louis was arrested for a hit and run charge. She was incarcerated for approximately one month. In August 2013, she was released. On October 24, 2013, Saint-Louis failed to appear at a court hearing on the matter and, as a result, a warrant was issued for her arrest.

In November 2013, Saint-Louis was arrested. She pleaded guilty to one count of hit and run, one count of vehicular assault, and one count of taking a motor vehicle without permission in the second degree. She also pleaded guilty to two counts of attempted forgery arising from a separate incident.

Saint-Louis was incarcerated from November 2013 to June 2014. On January 31, 2014, while she was incarcerated, the Department filed a petition for termination of Saint-Louis's parental rights.

For two brief periods, Saint-Louis was on work release. The first time was for approximately one week in March 2014; the second was for approximately two weeks in April 2014. While on her second work release in April, Saint-Louis's social worker, Alyssa Livingston, met with her to review services, which had not been started but had been referred. They spoke about setting up visits and discussed Saint-Louis's participation in the Incredible Years parent education program.

Saint-Louis had the option of going on work release again, but she opted against it. Nevertheless, she participated in domestic violence services while incarcerated. She also saw someone from Sound Mental Health twice each week.

In June 2014, Saint-Louis called Livingston after she was released from jail. At that point, Livingston made referrals for Saint-Louis to begin UA testing. She also made referrals to the Incredible Years parent education program and scheduled visits between

Saint-Louis and D.L.B. Saint-Louis began the program in late 2013, but she missed several classes and was discharged. She began the program again on July 29, 2014.

The termination hearing took place at the end of July 2014. The trial court terminated Saint-Louis's parental rights.

Saint-Louis appeals.

## ANALYSIS

Parents have a fundamental liberty interest in the care and welfare of their children. In re Dependency of Schermer, 161 Wn.2d 927, 941-42, 169 P.3d 452 (2007). To terminate parental rights, the Department must satisfy a two-pronged test. In re Dependency of K.N.J., 171 Wn.2d 568, 576, 257 P.3d 522 (2011). The Department must first prove the statutory elements set forth in RCW 13.34.180(1)(a) through (f)[6] by clear, cogent, and convincing evidence. K.N.J., 171 Wn.2d at 576-77.

---

[6] RCW 13.34.180(1) states, in pertinent part:

A petition seeking termination of a parent and child relationship may be filed in juvenile court by any party, including the supervising agency, to the dependency proceedings concerning that child. Such petition shall conform to the requirements of RCW 13.34.040, shall be served upon the parties as provided in RCW 13.34.070(8), and shall allege all of the following unless subsection (3) or (4) of this section applies:

(a) That the child has been found to be a dependent child;

(b) That the court has entered a dispositional order pursuant to RCW 13.34.130;

(c) That the child has been removed or will, at the time of the hearing, have been removed from the custody of the parent for a period of at least six months pursuant to a finding of dependency;

(d) That the services ordered under RCW 13.34.136 have been expressly and understandably offered or provided and all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been expressly and understandably offered or provided;

(e) That there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future . . . ;

. . . ; and

(f) That continuation of the parent and child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home. If the parent is incarcerated, the court shall consider whether a parent maintains a

Evidence is clear, cogent, and convincing if it established the ultimate fact in issue as "'highly probable.'" In re Dependency of K.R., 128 Wn.2d 129, 141, 904 P.2d 1132 (1995) (internal quotation marks omitted) (quoting In re Sego, 82 Wn.2d 736, 739, 513 P.2d 831 (1973)). If the trial court finds that the Department has met its burden under RCW 13.34.180, it may terminate parental rights if it also finds by a preponderance of the evidence that termination is in the "best interest" of the child. K.N.J., 171 Wn.2d at 577.

Where the trial court has weighed the evidence, our review is limited to determining whether the court's findings of fact are supported by substantial evidence and whether those findings support the court's conclusions of law. In re Dependency of P.D., 58 Wn. App. 18, 25, 792 P.2d 159 (1990). "'Substantial evidence' is evidence in sufficient quantity to persuade a fair-minded, rational person of the truth of the declared premise." In re Welfare of T.B., 150 Wn. App. 599, 607, 209 P.3d 497 (2009) (quoting World Wide Video, Inc. v. City of Tukwila, 117 Wn.2d 382, 387, 816 P.2d 18 (1991)). The determination of whether the findings of fact are supported by substantial evidence "must be made in light of the degree of proof required." P.D., 58 Wn. App. at 25. In determining whether substantial evidence supports the trial court's findings, this court does not weigh the evidence or the credibility of witnesses. In re Dependency of E.L.F., 117 Wn. App. 241, 245, 70 P.3d 163 (2003).

---

meaningful role in his or her child's life based on factors identified in RCW 13.34.145(5)(b); whether the department or supervising agency made reasonable efforts as defined in this chapter; and whether particular barriers existed as described in RCW 13.34.145(5)(b) including, but not limited to, delays or barriers experienced in keeping the agency apprised of his or her location and in accessing visitation or other meaningful contact with the child.

## Application of RCW 13.34.180(1)(f)

Saint-Louis first contends that the termination order must be reversed because the Department failed to prove, and the trial court failed to consider, the recent statutory amendments pertaining to incarcerated parents. We disagree.

Effective July 2013, the legislature amended several statutes in the Juvenile Court Act in a law entitled, "An Act Relating to the rights of parents who are incarcerated." LAWS OF 2013, ch. 173 (amending RCW 13.34.067, .136, .145, .180). One of the amended provisions was to RCW 13.34.180(1)(f), the sixth element of the parental rights termination statute. LAWS OF 2013, ch. 173 § 4. The legislature added three specific factors that the trial court must consider before terminating the parental rights of a parent who "is incarcerated." LAWS OF 2013, ch. 173 § 4; see In re Dependency of A.M.M., 182 Wn. App. 776, 786, 332 P.3d 500 (2014). Amended subsection .180(1)(f) states, in part:

> *If the parent is incarcerated,* the court shall consider [(1)] whether a parent maintains a meaningful role in his or her child's life based on factors identified in RCW 13.34.145(5)(b)[[7]]; [(2)] whether the department or

---

[7] RCW 13.34.145(5)(b) (as amended by LAWS OF 2013, ch. 173 § 3), provides:
The court's assessment of whether a parent who is incarcerated maintains a meaningful role in the child's life may include consideration of the following:
(i) The parent's expressions or acts of manifesting concern for the child, such as letters, telephone calls, visits, and other forms of communication with the child;
(ii) The parent's efforts to communicate and work with the department or supervising agency or other individuals for the purpose of complying with the service plan and repairing, maintaining, or building the parent-child relationship;
(iii) A positive response by the parent to the reasonable efforts of the department or the supervising agency;
(iv) Information provided by individuals or agencies in a reasonable position to assist the court in making this assessment, including but not limited to the parent's attorney, correctional and mental health personnel, or other individuals providing services to the parent;
(v) Limitations in the parent's access to family support programs, therapeutic services, and visiting opportunities, restrictions to telephone and mail services, inability to participate in foster care planning meetings, and difficulty accessing lawyers and participating meaningfully in court proceedings; and

supervising agency made reasonable efforts as defined in this chapter; and [(3)] whether particular barriers existed as described in RCW 13.34.145(5)(b) including, but not limited to, delays or barriers experienced in keeping the agency apprised of his or her location and in accessing visitation or other meaningful contact with the child.

(Emphasis added.)

The parties dispute the application of RCW 13.34.180(1)(f) to this case. Saint-Louis asserts that the plain meaning of subsection .180(1)(f), when viewed in context of the surrounding statutes, unambiguously conveys the legislature's intent to apply the amended factors to a parent who was incarcerated at some point during the dependency, even if the parent was not incarcerated at the time of the termination hearing. The Department, on the other hand, contends that the factors apply only if the parent is incarcerated at the time of the termination trial.[8] We agree with the Department. Upon an examination of the plain language of RCW 13.34.180(1)(f) and other related amendments enacted in the same session law, we conclude that the factors contained within subsection .180(1)(f) must be proven only if the parent is incarcerated at the time of the termination hearing.

The issue before us is one of statutory interpretation, which we review de novo. State v. Bradshaw, 152 Wn.2d 528, 531, 98 P.3d 1190 (2004). The purpose of statutory interpretation is to carry out the legislature's intent. State v. Eaton, 168 Wn.2d 476, 480, 229 P.3d 704 (2010). Construction of a statute must be consistent with the statute's

---

(vi) Whether the continued involvement of the parent in the child's life is in the child's best interest.

[8] The Department initially asserts that Saint-Louis waived this claimed error by failing to raise the issue concerning RCW 13.34.180(1)(f) at the termination hearing. However, this court has discretion to review a claim raised for the first time on appeal, and we exercise that discretion here. See State v. Blazina, 182 Wn.2d 827, 344 P.3d 680, 683 (2015) ("RAP 2.5(a) grants appellate courts discretion to accept review of claimed errors not appealed as a matter of right.").

underlying purposes and must avoid constitutional deficiencies. Eaton, 168 Wn.2d at 480. Reviewing courts presume the legislature did not intend absurd results. Eaton, 168 Wn.2d at 480.

Statutory interpretation starts with the statute's plain meaning. State v. Slattum, 173 Wn. App. 640, 649, 295 P.3d 788 (2013). "If the meaning of the statute is plain, the court discerns legislative intent from the ordinary meaning of the words." Tesoro Ref. & Mktg. Co. v. State, Dep't of Revenue, 164 Wn.2d 310, 317, 190 P.3d 28 (2008). "'In determining the plain meaning of a provision, we look to the text of the statutory provision in question, as well as the context of the statute in which that provision is found, related provisions, and the statutory scheme as a whole.'" State v. Garcia, 179 Wn.2d 828, 836-37, 318 P.3d 266 (2014) (internal quotation marks omitted) (quoting State v. Ervin, 169 Wn.2d 815, 820, 239 P.3d 354 (2010)). We give effect to the plain meaning of the statute if it is plain on its face. Slattum, 173 Wn. App. at 649.

Saint-Louis's interpretation conflicts with the verb tense used in the text of subsection .180(1)(f). The statutory text, "if the parent *is* incarcerated," uses the present tense form of the verb "to be." (Emphasis added.) Applying ordinary English grammar, the present tense does not refer to parents who have already been incarcerated; rather, it indicates that the subsection's application is limited to those currently incarcerated. Thus, the plain language of subsection .180(1)(f) shows that the legislature contemplated that RCW 13.34.180(1)(f) be applied to parents who are incarcerated at the time of the termination hearing, and not to parents incarcerated before the hearing.

The legislature's use of specific temporal language in other provisions of the 2013 law confirms that the legislature intended to limit the application of subsection .180(1)(f)

to parents who are incarcerated at the time of the termination hearing. For example, RCW 13.34.145(4)(a)(iv)[9] states that one "good cause exception" to filing a termination petition is where "[t]he parent *is incarcerated*, or the parent's *prior incarceration* is a significant factor in why the child has been in foster care . . . ." LAWS OF 2013, ch. 173 § 3 (emphasis added). RCW 13.34.145(4)(c) similarly provides specific temporal language: "The constraints of a parent's *current or prior incarceration* . . . may be considered . . . ." LAWS OF 2013, ch. 173 § 3 (emphasis added). Under RCW 13.34.180(1)(e)(iii), the court may consider "mitigating circumstances, such as a parent's *current or prior* incarceration." LAWS OF 2013, ch. 173 § 4 (emphasis added). And under RCW 13.34.180(2), "[a]s evidence of rebuttal to any presumption established pursuant to subsection (1)(e) of this section, the court may consider the particular constraints of a parent's *current or prior incarceration*." LAWS OF 2013, ch. 173 § 4 (emphasis added). Thus, the legislature's deliberate use of temporal language in other provisions amended in the same session law strongly suggests that its use of the present tense in "is incarcerated" was not inadvertent. If the legislature intended to encompass prior incarceration in RCW 13.34.180(1)(f), it would have done so.

Saint-Louis contends that the legislature's overarching changes in 2013 illustrate its intent that a parent's incarceration be considered at all stages of the dependency process, no matter when in the dependency the parent was incarcerated. While we agree that the overall purpose of the changes was to protect the rights of incarcerated parents, we do not read the amendments as broadly as Saint-Louis suggests. Rather, an

---

[9] RCW 13.34.145(4) was renumbered as RCW 13.34.145(5) when the code reviser incorporated all 2013 amendments to this section. See LAWS OF 2013, ch. 173 § 3, ch. 206 § 1, ch. 332 § 3 (effective July 28, 2013).

examination of the amendments enacted in the 2013 law demonstrates the legislature's intent to give incarcerated parents the opportunity to participate and have their rights considered during discrete stages of the dependency and termination process, such as during the case conference, when developing a permanency plan and at the permanency planning hearing, and at the termination hearing. See LAWS OF 2013, ch. 173 § 1 (amending RCW 13.34.067(3) to require that an incarcerated parent be provided the option to participate in the case conference through teleconference or videoconference); LAWS OF 2013, ch. 173 § 2 (amending former RCW 13.34.136(2)(b)(i), recodified as RCW 13.34.136(2)(b)(i)(A) by Laws of 2014, ch. 163 § 2, to require that the permanency plan of care address how the incarcerated parent will participate in the case conference and permanency plan meetings, include available resources at the facility where parent is confined, and provide for visitation unless it is not in the child's best interests); LAWS OF 2013, ch. 173 § 3 (amending former RCW 13.34.145(4) to provide that at the permanency planning hearing, the parent's prior or current incarceration may constitute a "good cause" exception to ordering the Department to file a termination petition); LAWS OF 2013, ch. 173 § 4 (amending RCW 13.34.180(2) to provide that as evidence of rebuttal to any established presumption pursuant to RCW 13.34.180(1)(e), the trial court at the termination hearing may consider the constraints of the parent's current or prior incarceration); LAWS OF 2013, ch. 173 § 4 (amending RCW 13.34.180(5) to state that when a parent is sentenced to a long-term incarceration and has maintained a meaningful role in the child's life, the Department must consider placements that allow the parent to maintain the relationship). Thus, according to the structure and language of the amended provisions of the Juvenile Court Act, by the time of the termination hearing, if the parent

was incarcerated during one of those prior stages of the dependency, the trial court has already considered the parent's incarceration.

The plain meaning of the phrase, "is incarcerated," is unambiguous. A reading of the plain language, along with the statutory scheme as a whole and related provisions within RCW 13.34.180, makes clear that the trial court is not required to consider the amended factors set forth in RCW 13.34.180(1)(f) if the parent is not incarcerated at the time of the termination hearing, even if the parent was previously incarcerated during the dependency. The trial court did not err.

Reasonable Efforts to Offer Services

Saint-Louis next contends that the Department failed to meet its burden under RCW 13.34.180(1)(d) of proving that it made reasonable efforts to offer or provide her with all available services during her incarceration. She asserts the Department failed to offer her UA tests, an adequate parenting education program, and referral to a chemical dependency program. We disagree.

The Department may not terminate parental rights unless it proves that "all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been expressly and understandably offered or provided." RCW 13.34.180(1)(d).

A service is necessary within the meaning of the statute if it is needed to address a condition that precludes reunification of the parent and child. In re Welfare of C.S., 168 Wn.2d 51, 56 n.3, 225 P.3d 953 (2010). The services offered must be individually tailored to a parent's specific needs. In re Dependency of D.A., 124 Wn. App. 644, 651, 102 P.3d 847 (2004). The Department is not required to offer or provide services that would be

futile. In re Dependency of T.R., 108 Wn. App. 149, 163, 29 P.3d 1275 (2001). Services that might have been helpful need not be offered when a parent is unwilling or unable to make use of the service provided. In re Dependency of S.M.H., 128 Wn. App. 45, 54, 115 P.3d 990 (2005).

Saint-Louis was referred to Intensive Family Preservation Services, UA testing, the Incredible Years parent education program, a psychological evaluation, an FCAP evaluation, and mental health counseling. She was provided bus fare tickets to enable to her obtain those services.

Livingston testified she met with Saint-Louis several times to discuss services. She reviewed the service plan with Saint-Louis in late December 2012. Livingston first referred Saint-Louis to the Incredible Years parent education program in January 2013, after Dr. Tutty had made the recommendation. Livingston spoke with Saint-Louis on the phone and communicated with her via e-mail.

The Incredible Years parent education program and random UA tests were available to Saint-Louis when she was on work release and before and after her incarceration. Before she was incarcerated, Saint-Louis had numerous opportunities to engage in these services. She never followed through with them. She missed several UA tests and was referred to the Incredible Years parent education program on several occasions before and after she was in custody.

Despite her receipt of referrals to services and encouragement by the Department to engage in the services, Saint-Louis was unable or unwilling to complete many of the services. The trial court's finding is supported by substantial evidence.[10]

---

[10] Saint-Louis nevertheless contends that the Department failed to comply with RCW 13.34.136(2)(b)(i)(A). Under that provision, "If the parent is incarcerated," the permanency plan

14

Current Unfitness and Little Likelihood that Conditions Would be Remedied

Saint-Louis next challenges the trial court's findings that she was currently unfit to parent D.L.B. and there was little likelihood that conditions would be remedied so that D.L.B. could be returned to her in the near future. Each finding is supported by substantial evidence.

The Department must prove that the parent is currently unfit and "[t]hat there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future." RCW 13.34.180(1)(e); In re Welfare of A.B., 168 Wn.2d 908, 921, 232 P.3d 1104 (2010).

"To meet its burden to prove current unfitness in a termination proceeding, [the Department] is required to prove that the parent's parenting deficiencies prevent the parent from providing the child with 'basic nurture, health, or safety' by clear, cogent, and convincing evidence." In re Welfare of A.B., 181 Wn. App. 45, 61, 323 P.3d 1062 (2014).

By the time of the termination hearing, Saint-Louis had completed in-patient and out-patient chemical dependency programs. But she had relapsed over one year earlier and was just beginning a relapse prevention program. She had not been able to successfully complete the 90 days of UA tests without missed or diluted UAs. She participated in three domestic violence support groups, including one while in jail. However, at the time of the termination hearing, Saint-Louis was living with a man who had at least three domestic violence assault incidents, had a protection order issued against him as to his former spouse, and violated that order in 2012.

---

must "include treatment that reflects the resources available at the facility where the parent is confined." RCW 13.34.136(2)(b)(i)(A). However, Saint-Louis does not appeal the permanency plan order. We reject this argument.

15

Moreover, Saint-Louis was referred to the Incredible Years parent education program on several occasions (December 27, 2012, January 2, 2013, May 16, 2013, and after her June 2014 release from incarceration). This program was recommended by both Dr. Tutty and the FCAP evaluator. Saint-Louis began the program in late 2013, but she missed several classes and was discharged. She began the program again on July 29, 2014.

Although Saint-Louis had recently engaged in services, Livingston testified, Saint-Louis had no history that would suggest that she would continue to engage in those services and make progress. She testified that D.L.B. would be at risk because none of the original issues that brought him into protective custody had been remedied.

In all, by the time of the termination trial, Saint-Louis continued to have unresolved domestic violence issues, lack of parenting skills, and potential chemical dependency issues. As the evidence reflected, these uncorrected parenting deficiencies made Saint-Louis a serious risk to D.L.B. and prevented her from being able to provide D.L.B. with his basic needs. The trial court did not err in finding that Saint-Louis was currently unfit to parent D.L.B.

Nor did the court err in finding that there was little likelihood that Saint-Louis would correct her deficiencies within the foreseeable future. The focus of RCW 13.34.180(1)(e) is whether the identified deficiencies have been corrected. In re Welfare of M.R.H., 145 Wn. App. 10, 27, 188 P.3d 510 (2008). "Even where there is evidence that the parent may eventually be capable of correcting parental deficiencies, termination is still appropriate where deficiencies will not be corrected within the foreseeable future." In re Welfare of A.G., 155 Wn. App. 589, 590, 229 P.3d 935 (2010). Although the law provides

no numerical standard to measure the foreseeable future, this determination is a factual inquiry evaluated from "the child's point of view," which varies with the child's age. In re Dependency of A.C., 123 Wn. App. 244, 249, 98 P.3d 89 (2004) (citing In re Welfare of Hall, 99 Wn.2d 842, 851, 664 P.2d 1245 (1983)); see, e.g., T.R., 108 Wn. App. at 165-66 (one year is not foreseeable or near future for six-year-old child); Hall, 99 Wn.2d at 850-51 (eight months is not within the foreseeable future of a four-year-old child); In re Dependency of A.W., 53 Wn. App. 22, 32, 765 P.2d 307 (1988) (one year not in the near future of three-year-old child); P.D., 58 Wn. App. at 27 (six months not in near future of 15-month-old child).

Livingston testified that she believed there was little likelihood that conditions would be remedied so that D.L.B. could be returned to his mother in the near future. Livingston also said that Saint-Louis would have to consistently engage in services, such as the Incredible Years parent education program, relapse prevention, individual mental health counseling, for a minimum of six months before the Department would consider a transition plan. But the Court Appointed Special Advocate testified that waiting that long would be harmful to D.L.B. Substantial evidence supports the trial court's finding.

Affirmed.

Trickey

WE CONCUR:

2013 JUL 13

17