2016 DEC 12 AM 9: 19


# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| In the Matter of the Dependency of<br><br>S.J.A.G.V.<br>DOB: 10/14/2013 | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. 73899-2-I<br>(consolidated with<br>No. 73697-3-I)<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |
| STATE OF WASHINGTON,<br>DEPARTMENT OF SOCIAL AND<br>HEALTH SERVICES,<br><br>Respondent,<br><br>v.<br><br>MONTEL JACKSON,<br><br>Appellant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | FILED: December 12, 2016 |

APPELWICK, J. — Jackson's parental rights with respect to his infant son were terminated while he was incarcerated. Jackson argues that substantial evidence does not support the trial court's termination of his parental rights. He argues that he received insufficient notice of his parental deficiencies and that the trial court misapplied the two-step test for termination of parental rights. He

argues that the trial court violated the appearance of fairness and that he was improperly denied in-person visitation rights. We affirm.

## FACTS

S.J.A.G.V. was born to Cynthia Vaughn and Montel Jackson on October 14, 2013. Jackson assaulted Vaughn while she was pregnant with S.J.A.G.V. Jackson was homeless and a heroin user at the time of birth. S.J.A.G.V. has never been in the care of either parent.

After S.J.A.G.V. was born, Jackson attempted to visit S.J.A.G.V. in the hospital twice. Shortly thereafter, Jackson contacted a social worker for assistance in caring for S.J.A.G.V. He met with a Department of Social and Health Services (DSHS) social worker on November 27, 2013, to discuss "what [he] needed to do to be in [S.J.A.G.V.]'s life." The social worker served Jackson with the dependency petition at that meeting. On or about December 13, 2013, the social worker arranged a screening interview for Jackson to assist him in accessing inpatient treatment at Recovery Centers of King County. Jackson did not attend that screening interview. On December 16, he was arrested and jailed due to an outstanding warrant. An order of dependency as to S.J.A.G.V. was entered by default on December 20, 2013.

The social worker had no knowledge of Jackson's arrest and incarceration. Jackson was not aware of the possibility that he might be incarcerated, and thus did not notify the social worker that he might be incarcerated in the near future. To track down Jackson, the social worker tried searching a DSHS database for information on Jackson, but was unable to

contact him. The social worker sent several e-mails to Jackson, wrote numerous letters to Jackson's listed addresses, and called the telephone numbers that DSHS had on file, to no avail. But, the social worker notably never searched Department of Corrections (DOC) records for Jackson's whereabouts, which she testified was an "oversight." While in prison, Jackson did not attempt to contact the social worker. Jackson testified that he failed to telephone the social worker due to a lack of funds.

In October 2014, 10 months after Jackson was incarcerated, the King County Prosecutor's Office informed the social worker that Jackson was incarcerated at Walla Walla State Penitentiary. The social worker then immediately informed Jackson about the status of S.J.A.G.V., the order of dependency, and that Jackson would be required to correct parental deficiencies to regain custody of S.J.A.G.V. She also "strongly encourage[d]" him to seek appointed counsel. Jackson inquired about the well-being of S.J.A.G.V., and he and the social worker exchanged letters on that topic. Jackson was ultimately able to speak to the social worker by phone thanks to the assistance of a Walla Walla prison counselor. In March 2015, Jackson was transferred from Walla Walla to Cedar Creek Corrections Center.

DSHS petitioned for termination of Jackson's parental rights in January 2015.[1] The trial court entered findings of fact and conclusions of law that found

---

[1] The trial also sought termination of Vaughn's parental rights. But, her parental rights are not at issue in this case.

that the State met the requirements of RCW 13.34.180 to terminate Jackson's parent-child relationship with S.J.A.G.V. Jackson appeals.

## DISCUSSION

Jackson makes five arguments on appeal. First, he argues that substantial evidence does not support the trial court's termination of his parental rights. Second, he argues that he received insufficient notice of his parental deficiencies. Third, he argues that the trial court misapplied the two-step framework that a trial court must follow when terminating parental rights. Fourth, he argues that the trial court violated the appearance of fairness. Finally, he argues in a motion for discretionary review[2] that the trial court improperly limited his visitation rights to video, rather than in-person, visitation.

### I. Substantial Evidence to Support Termination

We first address whether substantial evidence supports the trial court's termination of Jackson's parental rights. To terminate a parent-child relationship, the State must prove by clear, cogent, and convincing evidence the six termination factors enumerated in RCW 13.34.180(1).[3] In re Welfare of A.B., 168

---

[2] The motion for discretionary review is consolidated with this appeal.

[3] In summary, 13.34.180(1)'s six factors are:

(a) that the child has been found to be a dependent child,

(b) that the court has entered a dispositional order,

(c) that the child has been or will be removed from the custody if the parent for at least six months pursuant to a finding of dependency,

(d) that the department has offered or provided reasonably available services capable of correcting the parental deficiencies,

(e) that there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future, for which the court should consider any (i) substance abuse, (ii) psychological incapacity, (iii) failure of the parent to have contact with the child for an extended period of time after the filing of the dependency petition, and

Wn.2d 908, 911, 232 P.3d 1104 (2010). When the parent is incarcerated, the court must also consider three additional subfactors under RCW 13.34.180(1)(f). Jackson's arguments related to RCW 13.34.180 focus on only whether DSHS provided reasonably available services, whether Jackson could remedy his deficiencies in the near future, and whether the trial court properly considered the three incarcerated parent subfactors.

When reviewing a trial court's decision to terminate parental rights, we give the trial court's decision great deference and will uphold its findings of fact if they are supported by substantial evidence from which a rational trier of fact could find the necessary facts by clear, cogent, and convincing evidence. In re Dependency of K.S.C., 137 Wn.2d 918, 925, 976 P.2d 113 (1999). Substantial evidence is evidence of sufficient quantity to persuade a fair-minded, rational person of the truth of the declared premise. In re Welfare of T.B., 150 Wn. App. 599, 607, 209 P.3d 497 (2009). Because of the highly fact-specific nature of termination proceedings, deference to the trial court is particularly important. In re Parental Rights to K.M.M, 186 Wn.2d 466, 477, 379 P.2d 75 (3 2016). We therefore defer to the trial court's determinations of credibility and persuasiveness of the evidence, and its findings will not be disturbed unless clear, cogent, and convincing evidence does not exist in the record. Id.

---

(f) that continuation of the parent and child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home.

5

A. Provision of Reasonably Available Services

Jackson first argues that DSHS failed to satisfy RCW 13.34.180(1)(d). This factor states:

> That the services ordered under RCW 13.34.136 have been expressly and understandably offered or provided and all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been expressly and understandably offered or provided.

Id. The services offered must be individually tailored to a parent's specific needs. See In re Dependency of D.A., 124 Wn. App. 644, 651, 102 P.3d 847 (2004). But, services that might have been helpful need not be offered when a parent is unwilling or unable to make use of the service provided. In re Dependency of S.M.H., 128 Wn. App. 45, 54, 115 P.3d 990 (2005). Even in instances where DSHS inexcusably fails to offer all necessary services, termination may still be appropriate if the service would not remedy the parent's deficiencies within the foreseeable future. K.M.M., 186 Wn.2d at 486.

With respect to "reasonably available services," Jackson asserts that while incarcerated he should have received chemical dependency and domestic violence services. But, the record shows that DSHS made reasonable efforts to provide services both before and while Jackson was incarcerated. Prior to incarceration, on December 13, 2013, the social worker set up a screening meeting for Jackson at Recovery Centers of King County to assist Jackson with heroin detoxification. Jackson did not show up at the meeting. A few days later, Jackson was incarcerated. The social worker then had no knowledge of his incarceration or whereabouts for nearly a year.

6

After learning of Jackson's whereabouts, DSHS contacted Jackson's counselor at the Walla Walla facility about available services. The counselor testified that some services, such as parenting classes, were available. Other services, such as domestic violence classes, were not available. But, after DSHS made contact with Jackson, he was transferred to a new facility. DSHS then contacted a counselor at the new facility, Paris Albertsen. Albertsen testified that DSHS inquired about the various services that would be available to Jackson at his facility. They discussed "chemical dependency evaluation and treatments," "cognitive behavioral programming," and "parenting programs." But, the availability of chemical dependency counseling was based on a priority list. Urinary analyses in the prison were available "on a random basis" or "for cause." There were no domestic violence classes at the facility. The social worker attempted to facilitate video visits between Jackson and the child. DSHS attempted to provide the few services that were reasonably available and necessary to address his deficiencies.

B. Likelihood That Conditions Will Be Remedied in the Near Future

Jackson also argues that substantial evidence does not support the trial court's finding regarding factor in RCW 13.34.180(1)(e). DSHS may not terminate parental rights unless "there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future." Id. Even when there is evidence that the parent may eventually be capable of correcting parental deficiencies, termination is still appropriate where deficiencies will not be corrected within the foreseeable future. In re Dependency of D.L.B.,

188 Wn. App. 905, 922-23, 355 P.3d 345 (2015) (D.L.B. I), aff'd, 186 Wn.2d 103, 376 P.3d 1099 (2016) (D.L.B. II).

At the time of trial, Jackson was still years from being able to care for S.J.A.G.V. Even assuming Jackson was able to remedy his deficiencies, the record indicated Jackson would not have been able to care for the child for about two-and-a-half more years due to his incarceration. What constitutes the "near future" for the purposes of RCW 13.34.180(1)(e) is determined from the child's point of view. See A.B., 168 Wn.2d at 932.

S.J.A.G.V.'s court appointed special advocate (CASA) described his (and his siblings') immediate need for stability as follows:

> They're in the state of limbo, not knowing what's going to—what permanence is, really. Am I going back to my mom; am I going back to stay with my grandma? And I think the sooner they have an idea of, this is my home, this is where I'm going to be for the next however many years, I think that-that would be great.

She also testified that "he's under two. So, near future is, what, tomorrow maybe, or in an hour, or next feeding. . . . he's very young."

Like in K.M.M., there was substantial evidence that, from S.J.A.G.V.'s perspective, two years was not the "foreseeable future." See 186 Wn.2d 486-87; see also In re the Dependency of T.R., 108 Wn. App. 149, 165-66, 29 P.3d 1275 (2001) (holding that substantial evidence supports trial court's finding that "at least an additional year of services" was not "a future 'near' enough for [a] six-year-old"); In re A.W., 53 Wn. App. 22, 32, 765 P.2d 307 (1988) ("Although 1 year may not be a long time for an adult decision maker, for a young child it may seem like forever."); In re the Dependency of P.D., 58 Wn. App. 18, 27, 792 P.2d

159 (1990) (holding that "in the life of a 15-month-old," a 6 month wait for placement with a parent "was not in the near future").

Over two years may be a reasonable period from Jackson's point of view. But, as the CASA testified, an additional two-and-a-half years is a significant period in the context of a two year old. S.J.A.G.V. has always been in the care of his grandmother. Jackson has never had a meaningful relationship with S.J.A.G.V. beyond two hospital visits shortly after birth. Once Jackson is released, he would have to develop a parent-child relationship with an approximately four year old child with virtually no prior in-person interaction. Like in K.M.M. and T.R., substantial evidence supports the trial court's finding that, from two year old S.J.A.G.V.'s perspective, the time frame for Jackson to be able to remedy his parental deficiencies was not the "near future."

C. Incarcerated Parent Subfactors

Jackson also alleges that the trial court's resolution of all three subfactors applicable to incarcerated parents was manifestly unreasonable. In 2013, the legislature added these three additional subfactors to RCW 13.34.180 to no longer tip the balance toward termination, and to require courts to make individualized determinations when deciding whether an incarcerated person's parental rights should be terminated. D.L.B. I, 188 Wn. App. 915; see D.L.B. II, 186 Wn.2d at 105. This provision states:

> If the parent is incarcerated, the court shall consider whether a parent maintains a meaningful role in his or her child's life based on factors identified in RCW 13.34.145(5)(b); whether the department or supervising agency made reasonable efforts as defined in this chapter; and whether particular barriers existed as described in

RCW 13.34.145(5)(b) including, but not limited to, delays or barriers experienced in keeping the agency apprised of his or her location and in accessing visitation or other meaningful contact with the child.

RCW 13.34.180(1)(f). The three (1)(f) incarcerated parent subfactors do not require specific findings. See In re Parental Rights to M.J., 187 Wn. App. 399, 409, 348 P.3d 1265 (2015). Rather, the trial court need only consider the subfactors. Id.; see also In re Parental Rights to E.D., 195 Wn. App. 673, 694-695, 381 P.3d 1230 (2016).

### 1. Maintains a Meaningful Role in the Child's Life

Jackson asserts that the trial court erred in its consideration of whether he maintains a meaningful role in S.J.A.G.V.'s life. The trial court found that this subfactor weighed in favor of the State because Jackson "has no role in the child's life." The trial court further noted that Jackson "did not reach out to the social worker, [and] did not reach out to the caregiver or to [S.J.A.G.V.] himself through letters or the like."

Whether a parent "maintains a meaningful role" is based on factors identified in RCW 13.34.145(5)(b).[4] Applying those factors, there was evidence

---

[4] RCW 13.34.145(5)(b) defines "meaningful role" based on the following factors:

(i) The parent's expressions or acts of manifesting concern for the child, such as letters, telephone calls, visits, and other forms of communication with the child;

(ii) The parent's efforts to communicate and work with the department or supervising agency or other individuals for the purpose of complying with the service plan and repairing, maintaining, or building the parent-child relationship;

(iii) A positive response by the parent to the reasonable efforts of the department or the supervising agency;

that the father did not maintain a meaningful role in the child's life. To begin, the father has never had a meaningful role to "maintain"—he visited his son twice in the hospital shortly after birth in October 2013. He was incarcerated around mid-December 2013 when the child was two months old. He occasionally contacted the mother and discussed the child with her. But, except for one unsuccessful attempt to enlist a friend to contact the social worker, he never made "efforts to communicate and work with the [DSHS]" about the dependency despite having been served with the dependency petition. RCW 13.34.145(5)(b)(ii).

Jackson cited lack of money as the reason he did not communicate with the social worker. But, his Walla Walla counselor testified that Jackson could have enlisted his help "if he did not have the ability to make a phone call" due to lack of money. And, the dependency order identified the need for drug treatment, but Jackson's Walla Walla counselor testified that Jackson did not ask him about available treatment services at Walla Walla until shortly before he left the facility after the social worker contacted Jackson.

---

(iv) Information provided by individuals or agencies in a reasonable position to assist the court in making this assessment, including but not limited to the parent's attorney, correctional and mental health personnel, or other individuals providing services to the parent;
(v) Limitations in the parent's access to family support programs, therapeutic services, and visiting opportunities, restrictions to telephone and mail services, inability to participate in foster care planning meetings, and difficulty accessing lawyers and participating meaningfully in court proceedings; and
(vi) Whether the continued involvement of the parent in the child's life is in the child's best interest.

The findings noted his later remorse and interest in developing a relationship with the child, but that this subfactor favored the state given Jackson's lack of a role in the child's life and lack of effort to facilitate a role in the child's life. The trial court adequately considered the facts relevant to the Jackson's meaningful role.

### 2. DSHS's Reasonable Efforts

Jackson also argues that the trial court did not adequately consider whether DSHS made reasonable efforts to prevent the need to remove the child from the home.

When DSHS first learned that Jackson was the possible father, it arranged for an inpatient screening interview with Recovery Centers of King County. Jackson did not attend that meeting. Unbeknownst to the social worker, Jackson was incarcerated three days later. Once the social worker located Jackson, she suggested that he contact the Office of Public Defense. She engaged with prison counselors. She requested information on available classes and inquired as to their availability. Unfortunately, few programs were available.

Jackson assigns error to the social worker's failure to locate Jackson on her own by searching online DOC records. As a result, DSHS did not contact Jackson between December 2013 and October 2014. Moreover, DSHS petitioned for termination less than three months after locating Jackson in prison at Walla Walla. The window for services was very short.

But, the record shows that the court considered the social worker's efforts to locate Jackson. The social worker searched a DSHS database for Jackson.

She made phone calls to the numbers she could find. She sent letters to the addresses listed in a DSHS database. Jackson knew how to contact the social worker, but did not do so. The social worker admitted that she failed to search DOC records and testified that it was an "oversight." The trial court was in the best position to judge the credibility of that testimony.

The trial court properly considered whether DSHS made reasonable efforts to locate Jackson and to provide services that would make it unnecessary to remove the child from the home. The trial court did not err in its consideration of this subfactor.

### 3. Barriers Impeding Contact with the Child

Lastly, Jackson argues that the trial court failed to properly consider the "significant barriers" he encountered while in prison. Under RCW 13.34.180(1)(f), the trial court must consider "whether particular barriers existed as described in RCW 13.34.145(5)(b), including, but not limited to, delays or barriers experienced in keeping the agency apprised of his or her location and in accessing visitation or other meaningful contact with the child." The trial court's findings explicitly address this subfactor: "Particular barriers did not exist as described in RCW 13.34.145(5)(b). None of those factors weigh in favor of the father. It was the father's power to have a role in [S.J.A.G.V.'s] life, but he has not done so."

Jackson points to two barriers: (1) "lack of funds to make phone calls," and (2) "participating in the case and accessing money." Jackson testified that he was unable to contact the social worker because he lacked money for phone

13

calls. But, Jackson's testimony shows that he was able to contact others in the outside world. He was also able to enlist his counselor at Walla Walla to help him contact the social worker, but he made such requests long after he arrived at Walla Walla and just before he left for a new facility. He testified that he made one attempt to enlist a friend to contact the social worker, but that this ended up falling through. Though Jackson may have encountered challenges in contacting the social worker, the record shows that he had tools at his disposal to overcome them and that the trial court properly considered those challenges. The trial court properly considered whether particular barriers existed.

In summary, we hold that substantial evidence supports the trial court's termination of Jackson's parental rights.

## II. Notice of Parental Deficiencies

The termination petition listed Jackson's parental deficiencies as "drug/alcohol abuse, child neglect, domestic violence (batterer's), and a criminal history." But, the trial judge's findings terminated Jackson's parental rights based on "substance abuse, domestic violence, lack of stability, lack of experience parenting, and refusal to follow orders." (Emphasis added.) Based on this discrepancy between the petition and the trial court's findings, Jackson argues that he had no notice of these final three deficiencies, and his due process right to adequate notice was therefore violated.

Parents have a fundamental liberty and property interest in the care and custody of their children. See Santosky v. Kramer, 455 U.S. 745, 753, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982); A.M.M., 182 Wn. App. at 790–91. That right

14

cannot be abridged without due process of law. A.M.M., 182 Wn. App. at 790–91. The due process protections afforded to parents in a termination hearing include notice and time to prepare and respond to charges. In re Dependency of H.W., 70 Wn. App. 552, 555 n.1, 854 P.2d 1100 (1993), aff'd by Troxel v. Granville, 530 U.S. 57, 120 S. Ct. 2054, 147 L. Ed. 2d 49 (2000). Whether a proceeding satisfies due process is a question that this court reviews de novo. In re Welfare of J.M., 130 Wn. App. 912, 920, 125 P.3d 245 (2005).

Two recent decisions, A.M.M. and In re Parental Rights to F.M.O., 194 Wn. App. 226, 374 P.3d 273 (2016), addressed similar notice issues. In A.M.M., this court addressed a parent's insufficient notice arguments where "neither the termination petition nor the dependency petition" mentioned one of the deficiencies that the trial court used to justify termination. 182 Wn. App. at 792. In reversing, the court reasoned that "[i]t has long been deemed critical that parents receive notice of the specific issues to be considered" in a termination hearing. Id. at 791. Because the trial court may have relied on a deficiency that the parent had no notice of, the court remanded. Id. at 792-93.

F.M.O. recently clarified A.M.M. The F.M.O. court noted that the A.M.M. decision rested on review of "the entire termination case record" for evidence of notice: "the termination is the endgame in lengthy proceedings where the parties have wrestled over the needed services during the previous years and there is no question what deficiencies are truly at issue." 194 Wn. App. at 231-32. It described the applicable standard as follows:

15

[I]t serves only form instead of substance to rigidly require notice be provided in the termination petition itself. Accordingly, we decline [parent] S.O.'s request to mandate that parental deficiencies be specified in the termination petition. Although notice must be provided, it need not necessarily be provided in the termination petition.

Id. at 232. The rule established through A.M.M. and F.M.O. require that a parent receive notice of deficiencies somewhere in the record, but not necessarily in the termination petition itself. Id. at 213 ("While the A.M.M. court looked at the two petitions, [dependency and termination,] the court did not limit itself to those documents.")

Applying that principle to this case, the threshold question is whether Jackson had sufficient notice from the overall record to allow him to correct and defend against the alleged deficiencies. Here, the grounds for termination in the petition and in the trial court's findings did not match. But, the overall record shows that Jackson was on notice of his (1) lack of experience parenting, (2) his lack of stability, and (3) refusal to follow orders.

Jackson's first source of notice was the dependency order itself. It required Jackson to undergo a parenting assessment, devoted an entire paragraph to Jackson's extensive criminal history, noted DSHS's inability to contact Jackson, and cited Jackson's "[v]iolation of a protection order two times in 2010 and once in 2009." After the court entered the dependency order, the social worker sent Jackson multiple letters advising him of the steps necessary to correct his deficiencies. A formal letter to Jackson dated October 27, 2014, directed Jackson in bolded print to participate in a "Parenting assessment and follow all recommendations." (Boldface omitted.) Jackson even testified that the

16

social worker had directed him to take parenting classes. A March 2015 letter to Jackson "strongly encouraged" him to participate in domestic violence classes, parenting classes, and to undergo a parenting assessment. Finally, the termination petition itself stated that "[t]he parents have not provided the children with a stable home in the past." (Emphasis added.) Under F.M.O., notice is sufficient if purported deficiencies appear somewhere in the record. 194 Wn. App at 276-77. Here, they did. Jackson did not have to hunt through a file to know what to do. He had delivered to him in writing adequate notice of (1) lack of experience parenting, (2) lack of stability, and (3) refusal to follow orders.[5]

III. Misapplication of Two-Step Termination Test

Jackson next argues that the trial court misapplied the two-step framework for terminating the parent-child relationship. To terminate the parent-child relationship, the trial court must find that the individual is not fit to be a parent. A.B., 168 Wn.2d at 925. When the trial court determines that the parent is unfit,

---

[5] CR 15(b) also forecloses Jackson's notice argument. "Under CR 15(b), pleadings are deemed amended to conform to evidence introduced without objection." Fenton v. Contemporary Dev. Co., Inc., 12 Wn. App. 345, 349, 529 P.2d 883 (1974). Here, the trial court heard admitted evidence that related to all three of the alleged unnoted deficiencies. Not only did Jackson not object to such testimony, he provided it. Jackson testified about being convicted of "breaking no-contact orders" in the past. The judge inquired about stability: "[H]ow quick do you think you'd have stable housing and a job and all that?" Jackson noted his need for parenting classes at various points throughout his testimony. At one point, he stated that he would not be able to care for the child until he was "financially stable . . . having somewhere to live, making sure I have a good income [so] I can provide for my son." Only on appeal does he contend that he did not receive proper notice. Accordingly, the pleadings may be deemed amended to conform to the evidence under CR 15(b).

it also must find that termination of the parent-child relationship is in the best interests of the child. Id.

During the termination hearing, including during his oral ruling,[6] the trial court made at least two statements suggesting that the best interests of the child were a priority, without mentioning the prerequisite unfit to parent requirement. But, the trial court's written findings explicitly found that Jackson was "currently unfit to parent." Despite these written findings, Jackson argues that the trial court's oral statements showed that it in fact erroneously applied the two steps.

Jackson's argument rests exclusively on A.B. In that case, the Court overturned a termination of a parent's rights based on a convolution of the two steps in the written findings. Id. at 927. There, "[n]owhere in its findings and conclusions... . . . did the court expressly find that Salas was then unfit to be a parent." Id. at 917. But, Jackson's case is critically different: the trial court's written findings and conclusions explicitly stated that he was "unfit to parent."

Jackson's arguments suggest that a trial court must find a parent unfit before it even acknowledges or addresses the child's interests. This is an overly rigid characterization of the two-part test. Even if the oral ruling conflicts with the written findings in this case, the written findings control. See State v. Kull, 155 Wn.2d 80, 88, 118 P.3d 307 (2005). And, here, the trial court explicitly found Jackson unfit to parent in the written findings. The trial court properly applied the two-step termination test.

IV. Appearance of Fairness

---

[6] The trial court's final written findings did not incorporate its oral ruling.

18

Jackson alleges that the trial court's line of questioning of Jackson was overly hostile and therefore violated the appearance of fairness. During trial, Jackson did not object to the questioning he now alleges was in error. RAP 2.5(a) states that an appellate court may refuse to review a claim of error that was not raised at trial. This doctrine of waiver applies to bias and appearance of fairness claims. State v. Morgensen, 148 Wn. App. 81, 91, 197 P.3d 715 (2008). RAP 2.5(a) gives us discretion to review this issue, but we decline to do so here. See Club Envy of Spokane, LLC v. Ridpath Tower Condo. Ass'n, 184 Wn. App. 593, 605, 337 P.3d 1131 (2014) ("Because an appearance of fairness claim is not a 'constitutional'" claim pursuant to RAP 2.5(a)(3), we will generally not consider it for the first time on appeal.").

V.    Denial of In-Person Visitation

Lastly, Jackson argues in a motion for discretionary review that the trial court improperly limited his visitation rights to video, rather than in-person visitation. However, a termination order eliminates all legal rights of a parent to his or her child, including visitation rights. In re Dependency of A.V.D., 62 Wn. App. 562, 575 n.13, 815 P.2d 277 (1991); RCW 13.34.200(1). Because we affirm the order terminating Jackson's parental rights, the motion for discretionary review is moot, and we decline to address it.

We affirm.

_Appelwick_ _J_

WE CONCUR:

19

No. 73899-2-I/20

Spearman, J.          Cox, J.

20