

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| In the Matter of the Dependency of | ) | No. 76261-3-I |
| | ) | |
| R.P.-S., | ) | |
| B.D. 02/18/2011, | ) | DIVISION ONE |
| | ) | |
| F.P.-S., | ) | UNPUBLISHED OPINION |
| B.D. 09/22/2008, | ) | |
| | ) | |
| Minor Children. | ) | |
| | ) | |
| In the Matter of the Dependency of | ) | Consolidated with |
| | ) | |
| R.P.-S., | ) | No. 76262-1-I |
| B.D. 02/18/2011, | ) | |
| | ) | |
| F.P.-S., | ) | |
| B.D. 09/22/2008, | ) | |
| | ) | |
| Minor Children. | ) | |
| | ) | |
| In the Matter of the Dependency of | ) | |
| | ) | No. 76263-0-I |
| R.P.-S., | ) | |
| B.D. 02/18/2011, | ) | |
| | ) | |
| F.P.-S., | ) | |
| B.D. 09/22/2008, | ) | |
| | ) | |
| Minor Children. | ) | |
| | ) | |
| In the Matter of the Dependency of | ) | |
| | ) | No. 76264-8-I |
| R.P.-S., | ) | |
| B.D. 02/18/2011, | ) | |
| | ) | |
| F.P.-S., | ) | |
| B.D. 09/22/2008, | ) | |
| | ) | |
| Minor Children. | ) | |
| | ) | |

No. 76261-3-I and consol. Nos. 76262-1-I, 76263-0-I, 76264-8-I, 76361-0-I and 76362-8-I / 2

| | | |
|---|---|---|
| In the Matter of the Dependency of | ) | |
| | ) | No. 76361-0-I |
| R.P.-S., | ) | |
| B.D. 02/18/2011, | ) | |
| | ) | |
| F.P.-S., | ) | |
| B.D. 09/22/2008, | ) | |
| | ) | |
| | ) | |
| Minor Children. | ) | |
| | ) | |
| In the Matter of the Dependency of | ) | |
| | ) | No. 76362-8-I |
| R.P.-S., | ) | |
| B.D. 02/18/2011, | ) | |
| | ) | |
| F.P.-S., | ) | |
| B.D. 09/22/2008, | ) | |
| | ) | |
| Minor Children. | ) | FILED: May 14, 2018 |
| | ) | |

TRICKEY, J. — The trial court terminated the parental rights of Fidel Padilla-Negrete and Carla Smith as to their sons F.P.-S (F.) and R.P.-S. (R.) after determining that they could not meet the special needs or ensure the safety of the boys. The court reached this conclusion after F. and R. spent three years in dependency and Padilla-Negrete and Smith received extensive services that did not remediate the parental deficiencies.

Padilla-Negrete and Smith both appeal, claiming that the Washington State Department of Social and Health Services (the Department) failed to prove by clear, cogent, and convincing evidence that all necessary services had been provided and the conditions were unlikely to be remedied such that F. and R. could be returned in the near future. We affirm the trial court's termination of Padilla-Negrete and Smith's parental rights.

2

FACTS

Padilla-Negrete and Smith are the parents of F., born September 22, 2008, and R., born February 18, 2011. Both F. and R. have special needs. F. has Attention Deficit Hyperactivity Disorder (ADHD) and a depressive disorder. R. has ADHD, significant developmental delays, and a sensory processing disorder. The boys also have behavioral issues and require constant supervision, beyond what is generally necessary for children of their ages. Padilla-Negrete and Smith also had two other children, born in 2010 and 2013.[1]

Padilla-Negrete was born and raised in a small agricultural community in rural Mexico. He told a service provider that in his culture, mothers care for the children while fathers are the financial providers. His primary language is Spanish. He has limited English language skills.

Smith has a long history with the Department. She had three older children involved in dependencies between 2006 and 2009. The Department filed dependency petitions in July 2006 for the two oldest children due to unsanitary living conditions and inadequate supervision. In 2007, Smith's third child went into dependency soon after he was born because of Smith's instability during pregnancy.

Right before the birth of her third child, Smith had a psychological evaluation associated with the dependency. She was diagnosed with "'Dependent Personality Disorder with Avoidant Traits.'"[2] The psychologist gave a very poor

---

[1] They relinquished custody of these two children in July 2016.
[2] Ex. 35 at 4.

3

prognosis and lacked "any faith that [Smith] will ever be able to safely and appropriately parent her children."[3] The two oldest children were returned to their father in December 2008, and their dependencies were dismissed in 2009. Smith relinquished her parental rights to the third child in 2008.

Smith, Padilla-Negrete, and their children became involved with the Department in February 2013 while Smith and Padilla-Negrete were temporarily separated. The Department responded after law enforcement reported that four-year-old F. had been found alone at the local grocery store for the second time in a month.[4] Padilla-Negrete was not living in the home. Smith admitted that she did not know how to keep her child from leaving her residence without permission.

A Department investigator made a follow-up visit to Smith's residence. She found a filthy home and unwashed, partially clothed children. The case was transferred to Family Voluntary Services. It was considered high risk due to the evidence of chronic neglect, the young ages of the children, and the actions of Smith in her prior dependency cases. The family was referred to Project SafeCare for in-home intervention.

After services began, multiple home visits demonstrated continuing issues with unsanitary environment, unkempt children, safety hazards, and undisciplined behavior. The boys were considered "'rough and out of control,'" climbing on the kitchen table and counters, throwing food, and hitting Smith. Smith thought her children were well behaved and minimized the problems in her home. Her

---

[3] Ex. 35 at 4.
[4] F. escaped multiple times from Smith's home.

4

parenting and safety standards did not improve after working with a parenting instructor.

In June 2013, Smith gave birth to a daughter with serious medical issues.[5] She was overwhelmed by her daughter's medical needs and the demands of three young sons. But she refused to send her sons to daycare despite the Department's offer of a referral and funding.

In August 2013, a public health nurse, who had been assisting with the baby's medical care, filed a Child Protective Services intake stating concerns about ongoing neglect. The children were taken into protective custody.[6] When the children were removed from Smith's residence, the daughter was hospitalized due to medical complications. The three boys needed significant dental work to address severe tooth decay. All four children went into foster care. The Department filed dependency petitions as to all four children.

In September 2013, Padilla-Negrete and Smith lost their housing. They moved into a one-room motel room where they lived for approximately 18 months.

In October 2013, Smith agreed to dependency for the four children. Padilla-Negrete defaulted. The children remained in foster care.

The dependency court ordered Smith to participate in a mental health assessment and a neuropsychological evaluation with a parenting component, and to follow all recommendations from the providers. She was also ordered to undergo individual counseling and parent coaching, and successfully complete a

---

[5] Ex. 1 at 5.
[6] Ex. 1 at 10.

parenting class. Padilla-Negrete was ordered to participate in the Incredible Years and Project SafeCare parenting classes, and receive parent coaching. Smith and Padilla-Negrete were allowed to have supervised weekly visits with the children.

Smith was referred to Julie Larsen, a mental health provider, for 15 sessions of individual counseling beginning November 2013. But Smith frequently cancelled or missed appointments, and Larsen terminated her services in March 2014.

In January 2014, Smith attended her court-ordered neuropsychological evaluation with Dr. Richard Coder. He conducted a psychological assessment of Smith and observed the family during one of their court-ordered visits. Dr. Coder diagnosed Dependent Personality Disorder.

Dr. Coder reported concerns about Smith's judgment, noting that she "does not have a history of exercising the kind of good judgment that will indicate that she can appropriately raise her children alone and safely."[7] He stated that Smith was "not capable of bringing forth the actions, the energy, the sustained intent to mother the children in the way that will guarantee their safety and attend to their development needs."[8] He concluded that "the likelihood that . . . Smith will achieve the mental health and life stability required to safely parent her children until they reach adulthood is minimal."[9]

Dr. Coder opined that, other than possible improvement with maturity, Smith would need "the reconstruction of her personality by deep and consistent therapy

---

[7] Ex. 59 at 22.
[8] Ex. 59 at 22.
[9] Ex. 59 at 22.

by psychologists or psychiatrists who have dedicated their work to that goal with that kind of work" in order to adequately care for her children. Unless this type of therapy was successful, Smith would need Padilla-Negrete or a fulltime caregiver to come into the home to help care for the children.

Smith and Padilla-Negrete began attending the Incredible Years parenting classes in February 2014. The classes were conducted in English, but an interpreter was provided for 15 of the 18 classes. When no interpreter was present, the teacher provided Spanish language videos. Smith also assisted in translating for Padilla-Negrete during those classes. Smith and Padilla-Negrete successfully completed the program in June 2014.

In May 2014, the Department filed termination petitions for all four children. In July 2014, Padilla-Negrete filed a motion to have the children returned home. The court denied Padilla-Negrete's motion.

Padilla-Negrete was ordered to participate in counseling services through a Spanish-speaking social services organization. The dependency court also ordered that all services include Spanish-speaking service providers or an interpreter.

Smith informed the Department that she was willing to commit to mental health counseling and received another referral for 15 sessions with Larsen. Larsen again discontinued therapy due to Smith's inconsistent attendance.

In September 2014, the dependency court held a permanency planning hearing. The dependency court found that although interpreters were not present for all services, the Department had made reasonable, albeit not perfect, efforts to

7

provide an interpreter for Padilla-Negrete. The court ordered Smith to participate in parent coaching, Positive Parenting Program (Triple P),[10] or comparable parent instruction. Padilla-Negrete was ordered to undergo a parenting assessment with a culturally appropriate assessor and to participate in Triple P or comparable parent coaching or instruction.

In February 2015, Esther Patrick began providing Smith and Padilla-Negrete with parent coaching services during family visits with the four children. For 13 months, Patrick spent three hours each week coaching the family. Patrick requested termination of her services in June 2016, after providing approximately 48 sessions.

During a dependency review hearing in February 2015, the court determined that Smith was only in partial compliance with its orders. The court also found that the Department's lack of an interpreter at many of the sessions was a failure to make reasonable efforts to provide services for Padilla-Negrete.

In March 2015, the court found both Padilla-Negrete and Smith to be partially compliant with the orders. Smith had completed a mental health intake at Sunrise Community Health in March 2015, but inconsistently attended counseling.

In May 2015, Beverly Pearl completed Foster Care Assessment Program evaluations for F. and R. Pearl concluded that reunification was not appropriate given Smith and Padilla-Negrete's capabilities and the needs of the children. Pearl recommended individual mental health treatment for both parents and an

---

[10] Triple P is an evidence-based parenting program that works with families and children in home to foster positive parenting strategies and management of misbehavior.

8

evidence-based parenting program, such as Parent-Child Interaction Therapy (PCIT)[11] or Triple P. But she opined that Smith and Padilla-Negrete were unlikely to make progress in the near future. Pearl's report also noted that the Department "has done a great job of offering every imaginable service" in "an extremely complex case."[12]

In April 2015, the Department sent Padilla-Negrete and Smith a letter that outlined four requirements that they needed to complete within eight weeks for a trial return home of the children. They had to have safe and stable housing, receive a parent coach report of sufficient progress, demonstrate Smith's regular and consistent participation in mental health counseling, and prove Padilla-Negrete's participation in a parenting assessment and implementation of the recommendations. If Smith and Padilla-Negrete completed these requirements, the Department would move for the court to grant a trial return home.

Padilla-Negrete attended a parenting assessment with Hereri Contreras in April 2015. Contreras was a culturally appropriate provider and native Spanish-speaker, and the assessment was conducted in Spanish.[13] Contreras observed Padilla-Negrete interact with the four children. She documented his difficulties managing the four children together, noting issues with redirecting behavior, relating to the children at their age and development level, and his passive parenting style. She attributed some of the difficulties to a language barrier

---

[11] PCIT is an evidence-based parenting program that places emphasis on improving the quality of the parent-child relationship and changing parent-child interaction patterns.
[12] Ex. 85 at 13.
[13] Ex. 78 at 5.

because the children lacked Spanish language skills. She also noted that Padilla-Negrete never lost his temper or patience, that he spoke in a calm tone of voice, and that he had a loving relationship with his children.

Contreras concluded that Padilla-Negrete needed to learn effective communication, positive discipline, executive voice and authority, collaborative and effective parenting and co-parenting, and parenting children with special needs. She also believed that he needed to learn age appropriate and effective discipline methods and routines, as well as child development and behavioral expectations.

Contreras opined that institutional mistrust and cultural beliefs limited Padilla-Negrete's availability to parent his children and his willingness to learn new roles and skills. He was raised with well-defined parental roles with the father as provider and mother as caregiver.[14] In order to improve his own parenting skills, Contreras concluded that Padilla-Negrete needed to be open to changing the traditional, conservative parenting beliefs that were limiting his ability to learn and change. Critically, Padilla-Negrete needed to realize Smith's significant deficiencies and limitations and learn how to balance her deficits with his own parenting. Contreras believed Padilla-Negrete and Smith's children were at risk of neglect if Padilla-Negrete could not learn to accept this new paradigm.[15]

Contreras recommended PCIT and individual bilingual and bicultural counseling. She also recommended that the children be exposed to Spanish

---

[14] Ex. 78.
[15] Ex. 78.

10

language and culture. She noted the necessity of ensuring that Padilla-Negrete understood his children's special needs. Contreras recommended that the Department explore options for the children to reside with Padilla-Negrete's family in Mexico.

In July 2015, Padilla-Negrete, his attorney, Patrick, and Janice Anderson, the social worker, met to discuss Smith's parenting deficiencies and the obstacles that made parent coaching difficult. They believed Padilla-Negrete could potentially parent the children with additional support from his family or another caregiver. But at that meeting, Padilla-Negrete did not appear to understand or share the Department's concerns about Smith's parenting capabilities or the need for him to take a more active role in parenting. He instead expressed a desire to distance himself from the parent coaching.

Because Padilla-Negrete and Smith had no relatives nearby, Patrick discussed the importance of "community supports," or building a family from people they knew.[16] But Padilla-Negrete rejected this suggestion. Patrick testified that "[t]hey didn't want community supports. [Padilla-Negrete] didn't want community supports. He wanted [Smith] to take care of the children. He believed [Smith] could take care of the children."[17]

In October 2015, the court, at another permanency placement hearing, determined that Smith and Padilla-Negrete could have weekly overnight visits for F. and R., individually. Padilla-Negrete was required to be present for the entirety

---

[16] 4 Report of Proceedings (RP) (Nov. 10, 2016) at 753.
[17] 4 RP (Nov. 10, 2016) at 753.

11

of all visits. By December 2015, in light of the success of the individual visits, the court ordered F. and R. to have joint overnights with Padilla-Negrete and Smith. Padilla-Negrete's presence was still required at all visits.

In November 2015, Padilla-Negrete and Smith obtained temporary housing. They moved into a permanent apartment in January 2016.

Lynnae Pompeo began providing Padilla-Negrete and Smith with Triple P services in June 2016. Pompeo is proficient in Spanish and did not need an interpreter to provide services. The educational materials for Triple P were also available in Spanish.

Pompeo thought that Padilla-Negrete and Smith had many strengths as parents. She reported that they spend quality time talking with the children, showing them affection, and encouraging good behavior through praise, affection, and attention. She observed that Padilla-Negrete and Smith love their children and enjoy engaging with them. She testified that she did not observe much of a language barrier between Padilla-Negrete and the children because the family had addressed the communication issue. Pompeo identified that Smith and Padilla-Negrete needed to improve the specificity of their instructions to the children and manage misbehavior in a more consistent manner.

Pompeo only had the opportunity to complete the instructional component of the Triple P program with Smith and Padilla-Negrete. Soon after, F. and R. were moved to a culturally appropriate, Spanish-speaking home in Kennewick, Washington. Padilla-Negrete and Smith were unable to continue taking parenting classes from Pompeo. Pompeo did not have an opportunity to observe the parents

No. 76261-3-I and consol. Nos. 76262-1-I, 76263-0-I, 76264-8-I, 76361-0-I and 76362-8-I / 13

implement the skills taught through Triple P.

The Department worked to establish visitation with F. and R. in Kennewick, which was complicated by the distance and the parents' travel limitations. Padilla-Negrete and Smith received approval for F. and R. to return to western Washington for one visit. The Department tried to coordinate services with Pompeo in order to continue Triple P services during this visit. But Pompeo suspended her services because she believed that sporadic sessions would not be beneficial to implementing the skills learned through Triple P.

*Termination Hearing*

In July 2016, Smith and Padilla-Negrete relinquished their parental rights to two of their four children. The court continued the termination proceedings for the other two children, F. and R. The termination trial for F. and R. was held in November 2016. At the time of the trial, F. was eight years old and R. was five years old. The boys had been in dependency and in foster care for over three years. They were living in a Spanish-speaking, culturally appropriate prospective adoptive home in eastern Washington. The termination trial lasted five days and 13 witnesses testified.

Dr. Coder testified that Smith clearly had very deep affection for her children. But he reported that she was "not sufficiently prepared and ready to keep her children safe and meet their needs over time."[18] He identified Padilla-Negrete's role as an important anchor and concluded that his presence was necessary for

---

[18] 1 RP (Nov. 7, 2016) at 161-62.

13

Smith to parent safely. Without Padilla-Negrete, he saw "the ship taking on water and likely sinking."[19] He reported a poor prognosis for Smith's ability to keep her children safe and meet their developmental and medical needs.

As to the recommended reconstruction therapy for Smith, Dr. Coder testified that this was "a tough job" and very few therapists do personality reconstruction.[20] Further, personality reconstruction is the least successful of the evidence-based therapies, with less supporting research and literature. Based on his assessment, Dr. Coder opined that Smith was not likely to have been successful with this therapy.

Contreras testified that she assessed Padilla-Negrete for "good enough" parenting, which meant that he would be able to meet the basic elements of discipline, bonding, nurturing, and a safe and consistent routine at home.[21] But she could not recommend him as a "good enough" parent.[22] She opined that Padilla-Negrete was not unsafe, but his inability to recognize Smith's parental deficiencies was a significant risk factor.

Contreras testified that Padilla-Negrete could not see that Smith was a risk factor for the children's well-being. She observed that Padilla-Negrete had difficulty setting boundaries with Smith, and might not be strong enough to prevent an unsafe situation. Padilla-Negrete did not know the details of Smith's previous dependency and termination cases. He also did not understand the importance of

---

[19] 1 RP (Nov. 7, 2016) at 163.
[20] 1 RP (Nov. 7, 2016) at 179.
[21] 4 RP (Nov. 10, 2016) at 687-88.
[22] 4 RP (Nov. 10, 2016) at 719.

14

knowing the risk factors from these previous cases.

Contreras also highlighted the importance of Padilla-Negrete's tightly held belief that his role was to provide, while the woman's role was to raise and nurture the children. He valued the family unit and he could not conceive of separating the children from their mother. He emphatically believed there was no better place for children than with their mother. He had a "conflict of decision-making but not because of lack of caring, of love. It was more about [his] priority are [his] children, but [his] role as a father should be providing, so [he] cannot compromise."[23]

Contreras testified that she recommended PCIT because she saw Padilla-Negrete's potential. Padilla-Negrete wanted to keep his family together and was willing and able to learn, but did not know how. Contreras envisioned PCIT that included parent interaction with a child while the provider observed through a one-way mirror and coached the parent through an earpiece. Contreras opined that PCIT would not help Padilla-Negrete recognize Smith's deficiencies, but would increase his awareness about what would benefit the children's health and safety.

Patrick testified about her 13 months of providing parent coaching to Smith and Padilla-Negrete. Most of the coaching sessions involved all four of their children. Her work with Padilla-Negrete and Smith far exceeded her normal level of services. Generally, she works with a family for 45 to 90 minutes a week for three to six months. Here, she spent three hours each week for 13 months with Padilla-Negrete and Smith.

---

[23] 4 RP (Nov. 10, 2016) at 694.

Although Patrick thought that Smith and Padilla-Negrete had participated in Incredible Years, SafeCare, and PCIT prior to her work with the family, she did not see evidence of their familiarity with the skills learned in those programs. Patrick did not coach Smith and Padilla-Negrete using PCIT or Triple P in their entirety. Instead, she used elements of both PCIT and Triple P, combining different models into a "toolbox" that she used to select techniques appropriate for the family.[24]

Patrick testified that she did not speak Spanish but had an interpreter present for most of the sessions. She also provided coaching materials in Spanish. Patrick did not believe that Padilla-Negrete's lack of English proficiency was a barrier to service because he spoke well and understood their conversations.

Patrick also opined that she was a culturally competent provider for Padilla-Negrete.[25] She was trained in "cultural humility," a type of "co-learning" where she provides services and the family teaches about culture.[26] Patrick also testified that she was familiar with the Mexican Hispanic culture because she grew up in it. "I live with it in my home every day."[27] She told the court that she took Padilla-Negrete's culture into account and talked about ways to integrate his culture while making sure his children were safe.

Patrick believed that Padilla-Negrete's pride and cultural norms contributed to his inability to admit vulnerability, but she tried to work with him to understand how to maintain his culture while adapting to the environment. Padilla-Negrete

---

[24] 4 RP (Nov. 10, 2016) at 682-83, 770.
[25] 4 RP (Nov. 10, 2016) at 787.
[26] 4 RP (Nov. 10, 2016) at 787.
[27] 4 RP (Nov. 10, 2016) at 788.

would not actively engage as a caregiver, maintaining the cultural norms of his upbringing. Patrick tried to work with the parents to build a support system for Padilla-Negrete, including possibly bringing family from Mexico to help or finding a larger home that would allow for live-in help. But Padilla-Negrete rejected community supports, because he believed Smith could take care of the children.

Patrick testified that parent coaching was challenging to deliver to Padilla-Negrete and Smith. Padilla-Negrete and Smith did not prepare for the visits, and sometimes needed to complete chores while Patrick waited. They frequently refused to participate in feedback sessions. Smith was initially more amenable to coaching but her engagement fluctuated based on her mood. Padilla-Negrete had difficulty engaging in the services from the beginning because he wanted a culturally appropriate provider. He was also frustrated by the crowded visits in their one-room motel room.

Padilla-Negrete had difficulties with coaching sessions because he could not simultaneously accept coaching and engage with his children. Padilla-Negrete had difficulty dividing his time among the children to build individual bonds with them. Further, Padilla-Negrete did not see the need for the individual sessions, believing the children just needed to play.

Smith was not cooperative with watching the three other children while Padilla-Negrete participated in individual sessions with one child. The parents "sabotaged" each and argued in front of the children.[28]

---

[28] 4 RP (Nov. 10, 2016) at 676.

17

During sessions with the whole family, Smith often became frustrated and walked away, sometimes leaving Padilla-Negrete with the children without warning. During one visit to a park, Smith became angry and left. Patrick attempted to talk with Smith to explain that she could not leave her children. Smith responded, "I can do whatever I want," walked away, and left her children alone at the park for 20 minutes.[29]

Overall, Patrick believed that little progress was made toward many of the parenting goals. She reported that Padilla-Negrete and Smith did not practice the parent coaching skill building. Their home had safety hazards that were never addressed. Further, the same concerns remained about their ability to parent, as Smith continued to become upset and leave the children, while Padilla-Negrete was unable to be the primary caregiver.

Patrick saw a safety risk in returning the children because Padilla-Negrete worked, Smith cared for the children, and Padilla-Negrete did not believe that Smith was a safety risk. Patrick testified that upon completion of her services, Padilla-Negrete and Smith had received all the services the Department had to offer and were still not capable of safely parenting their children.

The providers who testified on the issue all agreed that Smith and Padilla-Negrete had been provided or offered extensive services throughout the three years of dependency. Anderson, who worked with the family from February 2015 to July 2016, testified that all necessary services reasonably available and capable

---

[29] 4 RP (Nov. 10, 2016) at 654.

of correcting parental deficiencies were understandably offered or provided during her time as the family's social worker. She testified that PCIT and Triple P were not specifically ordered because Patrick incorporated those programs into her parent coaching sessions. The parent coaching had also helped Padilla-Negrete and Smith with understanding their children's special needs. The children were not placed in Spanish-speaking homes for most of the dependency, but Anderson worked with the foster families to provide activities to expose them to their father's language.

Karen Kelsey was the social worker assigned to the family in July 2016. She testified that an unusual amount of time and resources had been dedicated to this case. These resources included intensive efforts to provide Padilla-Negrete and Smith with overnight visits with F. and R. despite the children's relocation to Kennewick. Kelsey testified that all necessary services reasonably available and capable of correcting the parental deficiencies were understandably offered or provided.

Jennifer Coombs, the attorney guardian ad litem for the children, testified she did not believe that further parenting instruction would address Padilla-Negrete and Smith's parenting issues. She also did not believe that there would be a significant difference in terms of Padilla-Negrete and Smith's parenting abilities with two children, rather than four.

Anderson testified that the parents had made progress, particularly in the areas of nutrition and discipline. Smith attended the children's assessments and physical therapy. Both parents regularly attended visits and participated in parent

coaching. But despite some improvement and extensive parent education and coaching, most of the care providers testified to little improvement in parenting capabilities and recommended against reunification.

Kelsey believed there was little likelihood that F. and R. could be returned to Smith and Padilla-Negrete in the near future. Kelsey cited the lengthy history of the dependency and chronic nature of the family's issues as the reasons behind this opinion. She specifically noted the lack of supervision and inability to manage the children's behavioral issues.

The poor supervision and inability to manage behavior was underscored by testimony from Jessica Chapman, a supervisor for Padilla-Negrete and Smith's weekly visits with the four children from April to July 2016. She testified that the visits were relatively unstructured. The children generally watched television and played outside on the playground. Smith and Padilla-Negrete were inconsistent, did not follow through with discipline, and could not effectively manage the children's behavior. She observed Smith and Padilla-Negrete frequently yelling at the children. During one visit, R. spilled food on the couch and Padilla-Negrete hit him on the back of his head, hard enough to make R. cry.

Chapman also said that Smith and Padilla-Negrete fought and yelled at each other during the visits. The visits were chaotic, with children frequently crying or having a fit. Smith often seemed overwhelmed.

Chapman testified that she had to intervene several times to alert Smith that the boys were putting small items in their mouths until Smith finally removed the objects entirely. Chapman saw Smith and Padilla-Negrete leave hot oil unattended

on the kitchen stove. She also had to explain to Padilla-Negrete that Grand Theft Auto was an inappropriate video game for the children to play or watch, despite his observation of the extremely violent gameplay.

In addition to continuing parental deficiencies, Padilla-Negrete and Smith demonstrated a lack of improvement in their mental health. Anderson had concerns about Smith's mental health and her lack of judgment. Smith was cooperative but "had limited insight into what her parental deficiencies were and what the children's needs were."[30]

During the course of the dependency, Smith made minimal progress in her mental health counseling. Larsen testified that Smith was involved and invested when she attended her counseling sessions, but was unable to maintain a consistent appointment schedule. Larsen opined that they were "running in place."[31] Pearl believed that Smith was very inconsistent in accessing services, and would primarily reengage when the Department went forward with termination proceedings. She was concerned that if Smith was not motivated to access services while monitored by the dependency court, "then the long-term prognosis was not good, and it had a direct relationship to her parenting capacity and abilities."[32]

Pearl thought Padilla-Negrete would benefit from counseling from a culturally appropriate provider to help him learn to co-parent equally with Smith

---

[30] 1 RP (Nov. 7, 2016) at 201.
[31] 2 RP (Nov. 8, 2016) at 377.
[32] 3 RP (Nov. 9, 2016) at 443.

21

and to resolve their differences in parenting styles. But Pearl also noted Padilla-Negrete's lack of compliance with mental health counseling. Padilla-Negrete refused to engage in therapy despite the court order and numerous recommendations from providers. Anderson referred Padilla-Negrete to individual counseling but he did not make an appointment. Smith had informed Anderson that Padilla-Negrete did not think he needed either individual or couples counseling.

Several providers testified about the probability of future neglect. Kelsey believed that Smith was unfit to parent, and expressed concerns about Smith's ability to follow through and meet the children's needs. She also testified that Padilla-Negrete was unfit to parent because he was not actively engaged with parenting. Anderson had concerns that Padilla-Negrete did not understand F. and R.'s special needs. He did not participate in any of their assessments or therapy appointments, instead relying on Smith to attend. Although Padilla-Negrete learned parenting skills in the Incredible Years classes, he was unable to demonstrate them in visits.

Anderson noted that Padilla-Negrete lacked insight into the children's needs and Smith's mental health issues. Padilla-Negrete did not understand the Department's concerns about Smith's parenting capabilities or why he needed to take a more active and responsible role in parenting. He was not willing to take on the role as primary caregiver. He believed Smith's parenting skills were sufficient, and he hoped to distance himself from the parent coaching.

Padilla-Negrete's lack of understanding of Smith's parenting deficiencies

were clearly expressed during his testimony. He was protective of Smith. He believed that the home was safe, the children were clean and well-groomed, and Smith took good care of them.

Padilla-Negrete testified that the report of unsanitary conditions in the home was a "blatant lie" and "a pretext to take my children."[33] Padilla-Negrete attributed his daughter's hospitalization after she was removed from the home solely to her illness rather than neglect. He doubted the veracity of the social workers' reports about the condition of the home and children. He thought that witnesses were "not really stating the truth" in their testimony at the hearing.[34]

Padilla-Negrete also testified that Smith walked away during parent coaching because Patrick disrespected her. Patrick "made her get frustrated," so Smith walked away rather than become more frustrated or disrespect Patrick. Padilla-Negrete also said that he and Smith argued during visits because of the social workers and providers, particularly Patrick, and because they believed their children were mistreated in foster care.

Padilla-Negrete still found no reason to be interested in Smith's dependency history. He testified that Smith is a good person and a good mother. Smith had explained the past situation and he understood. Padilla-Negrete expressed no concern about Smith's past or present parenting. He did not acknowledge any problems in the home. After listening to the other witnesses' testimony, Padilla-Negrete still did not understand why F. and R. had not been returned to their care.

---

[33] 1 RP (Nov. 7, 2016) at 124.
[34] 3 RP (Nov. 9, 2016) at 533.

The termination court waited several weeks to rule on the petition for termination. The court reluctantly terminated Smith and Padilla-Negrete's parental rights. The court stated, "This has nothing to do with the failure of the Department understandably and expressly offering or providing necessary services. It has everything to do with parents who either will not or cannot ensure the safety of their children, even to a degree that amounts to 'good enough' parenting."[35]

Smith and Padilla-Negrete both appeal.

## ANALYSIS

"Parents have a fundamental liberty interest in the care and welfare of their minor children." In re Dependency of Schermer, 161 Wn.2d 927, 941, 169 P.3d 452 (2007). To terminate parental rights, the Department must satisfy a two-pronged test. In re Dependency of K.N.J., 171 Wn.2d 568, 576, 257 P.3d 522 (2011).

First, the Department must prove six statutory elements by clear, cogent, and convincing evidence. In re Parental Rights to B.P., 186 Wn.2d 292, 312, 376 P.3d 350 (2016). These elements include:

> (d) That the services ordered under RCW 13.34.136 have been expressly and understandably offered or provided and all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been expressly and understandably offered or provided;
>
> (e) That there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future.

---

[35] 6 RP (Dec. 9, 2016) at 988.

RCW 13.34.180(1). Clear, cogent, and convincing evidence exists when the ultimate fact at issue is shown by evidence to be "highly probable." In re Dependency of K.R., 128 Wn.2d 129, 141, 904 P.2d 1132 (1995).

Second, once the State has proven these factors by clear, cogent, and convincing evidence, the termination court evaluates whether termination of parental rights is in the best interests of the child. K.N.J., 171 Wn.2d at 577. This step must be proven only by a preponderance of the evidence. In re Welfare of A.B., 168 Wn.2d 908, 911, 232 P.3d 1104 (2010).

"The termination order will be upheld if there is substantial evidence which the lower court could reasonably have found to be clear, cogent and convincing to support the termination findings." In re Dependency of A.M., 106 Wn. App. 123, 131, 22 P.3d 838 (2001). The trial court's findings of fact will not be disturbed as long as they are supported by substantial evidence in the record. B.P., 186 Wn.2d at 313. "Substantial evidence is evidence sufficient to persuade a fair-minded, rational person of the truth of the declared premise." In re Welfare of C.B., 134 Wn. App. 942, 953, 143 P.3d 846 (2006). This court does not weigh the evidence or the credibility of the witnesses. In re Dependency of D.L.B., 188 Wn. App. 905, 914, 355 P.3d 345 (2015).

*Necessary Services*

Smith and Padilla-Negrete both argue that the Department failed to provide necessary services for reunification. We disagree because the Department demonstrated that all ordered and necessary services reasonably capable of correcting their parental deficiencies were offered.

25

The Department is obligated to provide all services ordered in the permanency plan as well as "'all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future.'" In re Parental Rights to K.M.M., 186 Wn.2d 466, 479, 379 P.3d 75 (2016) (quoting RCW 13.34.180(1)(d)). "Necessary services" are those "needed to address a condition that precludes reunification of the parent and child." In re Dependency of A.M.M., 182 Wn. App. 776, 793, 332 P.3d 500 (2014). Those services must be expressly and understandably offered. RCW 13.34.180(1)(d). The services must also be individually tailored to meet the needs of the parents. D.L.B., 188 Wn. App. at 920.

A parent is entitled to all services available to address a barrier to reunification, unless the Department shows that providing the services would be futile. B.P., 186 Wn.2d at 316. "The provision of services is futile where a parent is unwilling or unable to participate in a reasonably available service that has been offered or provided." K.M.M., 186 Wn.2d at 483. If an offer of services would be futile, the trial court may find that the Department has offered all reasonable services. K.M.M., 186 Wn.2d at 483 (quoting In re Welfare of C.S., 168 Wn.2d 51, 56 n.2, 225 P.3d 953 (2010)).

*Smith's Necessary Services*

Smith argues that the Department failed to prove that all ordered and necessary services were provided because she did not received personality reconstruction therapy or Triple P in its entirety.

The termination court determined that the lack of personality reconstruction therapy was not a failure to offer all services, because the therapy was not capable

of correcting Smith's parental deficiencies within the foreseeable future. The court found that the therapy was not likely to be helpful and Smith was not likely to have engaged in it. Smith challenges this factual finding and argues that the Department failed to offer her a necessary service to correct her parental deficiencies. We agree with the court, because personality reconstruction therapy was not a court ordered service, or reasonably available and able to correct her deficiencies in the near future.

At the termination hearing, Dr. Coder opined that "deep and consistent" personality reconstruction therapy was the only treatment that could potentially correct Smith's deficiencies. During the dependency, the court's orders only required the Department to offer individual mental health counseling without specifying a particular type of therapy. While the dependency court's orders also directed Smith to follow the recommendations of evaluators and service providers, Dr. Coder identified personality reconstruction therapy as the only possible means of correcting Smith's deficiencies, not as a recommendation. Therefore, personality reconstruction therapy was not a court ordered service that the Department was obligated to offer.

In addition, personality reconstruction therapy was also not reasonably available. Dr. Coder testified that this type of therapy is "a tough job" and "[v]ery few people do that personality reconstruction."[36] He did not provide the Department or Smith with resources for the service.

---

[36] 1 RP (Nov. 7, 2016) at 179.

Further, Dr. Coder testified that more likely than not, Smith would not have been successful even if she underwent the personality reconstruction therapy. This type of therapy is very difficult and the least successful of the evidence-based treatments. Client compliance with medical treatment is an indicator for success with therapy. Smith's inconsistent treatment history suggests that she would have had difficulty engaging in prolonged and challenging therapy. Substantial evidence supports the termination court's finding that Smith would not have engaged in deep personality reconstruction therapy had the Department offered the service.

Personality reconstruction therapy was not a necessary service that the Department was required to provide. This specific therapy was not court ordered, reasonably available, or capable of correcting Smith's deficiencies in the foreseeable future.

Smith also claims that the Department failed to offer or provide all necessary parent coaching, specifically Triple P, and that the coaching she and Padilla-Negrete received was conducted in a chaotic environment with a provider with whom they had difficulty. But evidence in the record shows that Smith and Padilla-Negrete received parenting instruction for almost three years, including 13 months of intensive, personalized parent coaching.

Smith and Padilla-Negrete had numerous providers for parent education and coaching. Patrick provided more than double the amount of parent coaching that she normally offered to families. She incorporated elements of Triple P into her individual coaching for a more tailored approach to Smith and Padilla-Negrete's needs. Pompeo also provided Triple P training. While Pompeo's work

28

with Padilla-Negrete and Smith was suspended when the children move to Kennewick, they completed the educational component.

Multiple providers testified that the parent coaching sessions were difficult and chaotic. But these difficulties were unrelated to Patrick's coaching. For example, many of the sessions took place in a small crowded motel room. The children had frequent tantrums, and Padilla-Negrete and Smith argued with one another. Patrick worked within these stressful conditions to provide the best coaching possible.

The Department offered extensive parent education for Padilla-Negrete and Smith. The record demonstrates that Smith and Padilla-Negrete made little improvement in their parenting capabilities despite the hours of education and coaching. While Triple P was not offered in its entirety, the court ordered parent education and coaching was extensive and prolonged. Therefore, substantial evidence supports the termination court's conclusion that the Department provided Smith with the necessary parent coaching.

*Padilla-Negrete's Necessary Services*

Padilla-Negrete assigns error to the termination court's finding that he would not make an appointment because he believed counseling was unnecessary. Padilla-Negrete also contends that the Department failed to offer adequate access to the necessary services of bilingual and culturally competent services, assistance with the F. and R.'s special needs, and the PCIT parenting program.

Padilla-Negrete argues that the trial court's finding that he would not make an appointment because he did not need counseling was unsupported by the

29

record. Specifically Padilla-Negrete claims that he attempted to make a counseling appointment but could not pay out of pocket. But because the record contains multiple examples of Padilla-Negrete's refusal to engage in mental health counseling, substantial evidence supports the trial court's finding on this issue.

The dependency court ordered Padilla-Negrete to participate in individual counseling. Padilla-Negrete was referred to La Esperanza and Sea-Mar for services with Spanish-speaking providers. Contreras also recommended counseling. But despite the clear orders of the court and recommendations from service providers, Padilla-Negrete chose not to participate in counseling. Padilla-Negrete told Patrick that he thought that it was "'ridiculous'" that he needed to attend counseling.[37] He believed that counseling was a waste of time.

Substantial evidence supports the court's finding that Padilla-Negrete chose not to make an appointment with a counselor. Padilla-Negrete's failure to participate in individual counseling was due to his own beliefs, rather than the Department's failure to offer or provide the service. The Department made referrals for the court ordered counseling. The Department attempted to provide the ordered service, but Padilla-Negrete chose not to comply.

Next, Padilla-Negrete argues that the Department did not provide him with the necessary bilingual and bicultural services. The Department claims it satisfied its duty to provide individually tailored services by offering bilingual, bicultural services and interpreters throughout the dependency process. Although the

---

[37] 4 RP (Nov. 10, 2016) at 671.

bilingual and bicultural services were not optimal, we conclude that the Department has demonstrated that it provided these ordered and necessary services.

The Department is obligated to provide all services ordered in the permanency plan as well as "'all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future.'" K.M.M., 186 Wn.2d at 479 (quoting RCW 13.34.180(1)(d)). Those services must be tailored to the parent's specific needs. D.L.B., 188 Wn. App. at 920. In the case of non-English speaking parents, this includes bilingual services, qualified interpreters, and written communications in the native language. RCW 74.04.025(1); WAC 388-271-0020, -0030.

Here, the Department provided services tailored to fit Padilla-Negrete's needs due to his limited English proficiency. Contreras, a native Spanish-speaker from Mexico, provided a culturally competent parenting assessment conducted in Spanish. Pompeo spoke Spanish during Triple P sessions. Patrick provided educational materials in Spanish and an interpreter attended most of her coaching sessions. Patrick had little difficulty communicating with Padilla-Negrete during the coaching sessions with the help of interpreters or Smith, as needed.

An interpreter was present for 15 of the 18 Incredible Years classes. During the sessions without an interpreter, the provider showed videos in Spanish and Smith assisted with translation. These efforts were sufficient for Padilla-Negrete to successfully graduate from the Incredible Years program.

Similarly, Padilla-Negrete identifies the lack of culturally competent providers as a failure to tailor his services. The Department providers were

understanding of Padilla-Negrete's background and worked with him to try to find a resolution between his cultural norms and the family's issues. Contreras provided a culturally competent parenting assessment where she noted the role that Padilla-Negrete's traditional upbringing played in his parenting decisions. She also noted that he was faced with an inherent conflict between his values and the needs of his children. This was a fundamental conflict throughout the dependency.

Padilla-Negrete specifically argues that Patrick did not provide culturally competent services. Although Patrick was not bicultural, she understood Padilla-Negrete's values and attempted to integrate them with the needs of his children. She was trained in "cultural humility" and testified that she had personal insight into the Mexican Hispanic culture.[38] She attempted to work with Padilla-Negrete to integrate his cultural values with the present needs of his children. The providers were understanding of Padilla-Negrete's culture but could not remedy the conflict between his values and the needs of his children.

The Department has demonstrated that the ordered and necessary bilingual and bicultural services were provided. The bilingual and bicultural services were not perfect. But substantial evidence supports the court's conclusion that all necessary services were provided.

Padilla-Negrete argues the Department did not provide the services necessary to assist him in parenting his special needs children. But Padilla-Negrete failed to make any effort to participate in his children's therapy.

---

[38] 4 RP (Nov. 10, 2016) at 787-88.

32

Despite encouragement from providers, Padilla-Negrete never attended or participated in the children's therapy or assessments. He attended only one medical appointment. He relied on Smith to participate in the special care needed by both boys. Padilla-Negrete was provided ample opportunities to learn about the boys' special needs but failed to avail himself. This was not a deficiency in the Department's provision of services.

Finally, Padilla-Negrete contends that the Department failed to provide him with PCIT, which helps parents manage children with behavioral and emotional disorders. PCIT was not a court ordered service, but recommended by Contreras.

Contreras testified that PCIT was conducted with one-on-one parent interaction with a provider observing and coaching through an earpiece. But Contreras did not specify this technique in her recommendation. Patrick provided elements of PCIT in her parent coaching, without using the technique advocated by Contreras. According to Patrick, she was trained to use the earpiece method only in a controlled clinical setting. Here, the earpiece was impractical because coaching occurred at home or outside. Even without the earpiece, Padilla-Negrete received PCIT as part of the extensive parent education services provided by the Department.

Given all the evidence in the record, substantial evidence supports the court's conclusion that that all ordered and necessary services had been provided. The extensive services were expressly and understandably offered to both Smith and Padilla-Negrete. The Department proved this requirement of RCW 13.34.180 by clear, cogent, and convincing evidence.

*Likelihood of Remedying Conditions in the Near Future*

The termination court found that there was little likelihood that conditions would be remedied so that F. and R. could return to Padilla-Negrete and Smith in the near future. Padilla-Negrete and Smith argue that the court failed to define the term "near future," and that the Department failed to prove there was little likelihood that their deficiencies would be remedied in the near future. While the termination court did not explicitly establish a timeline for the "near future," the record supports the conclusion that Smith and Padilla-Negrete were not capable of improvement in the foreseeable future.

The Department must prove by clear, cogent, and convincing evidence that "there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future." RCW 13.34.180(e). This factor focuses on whether parental deficiencies have been remedied. In re Dependency of T.R., 108 Wn. App. 149, 165, 29 P.3d 1275 (2001). "What constitutes 'near future' depends on the age of the child and the circumstances of the child's placement." C.B., 134 Wn. App. at 954. One year is considered outside the foreseeable future for a six-year-old child. See T.R., 108 Wn. App. at 164-65.

Here, the termination court did not define "near future." Instead, the court found that "[n]either parent is going to improve in the foreseeable future, no matter what services have been or would be referred."[39] The court also found no reason to believe that the parents would be capable of "'good enough'" parenting in the

___

[39] Clerk's Papers (CP) at 42.

foreseeable future.[40] The termination court's finding that Smith and Padilla-Negrete would not be adequate parents in the foreseeable future means that the court could not envision a time when F. and R. could return to these parents.

Multiple providers testified about their concerns that Smith and Padilla-Negrete had made little improvement in their parenting skills after receiving three years of services. Kelsey testified that Smith's chronic lack of supervision and inconsistent engagement in services and counseling raised a significant concern about the likelihood that the conditions would be remedied in the near future. Pearl noted in her assessment that Padilla-Negrete and Smith received "a really large number of services" during the three years of dependency and that there was no major change in their parenting abilities.[41] Given this testimony, substantial evidence supports the termination court's finding that Smith and Padilla-Negrete were not capable of improvement in the foreseeable future.

In addition, F. and R. needed permanency. At the time of the termination trial, the children had been in dependency and away from their parents for three years. R. had lived away from Smith and Padilla-Negrete longer than he had lived with them.

Given the length of dependency, the ages of the children, and the parents' inability to remedy their deficiencies, substantial evidence supports the trial court's conclusion that there was little likelihood that conditions would be remedied such that F. and R. would be able to return to their parents in the near future.

---

[40] CP at 42.
[41] 3 RP (Nov. 9, 2016) at 442.

Padilla-Negrete argues that the Department failed to prove that circumstances would not improve in the near future because evidence showed him to be a safe parent at the time of trial. But this argument fails to acknowledge the issue that runs through this case—Padilla-Negrete cannot safely parent because he does not recognize Smith's deficiencies and is unwilling to make the changes necessary to compensate for those deficiencies.

Multiple providers emphasized Smith's inability to safely parent and Padilla-Negrete's denial of this issue. Testimony at the hearing plainly showed that Padilla-Negrete continued to believe that Smith was a good parent. He did not understand why F. and R. had not been returned home. After three years of extensive services, Padilla-Negrete was unable to recognize Smith's deficiencies.

Without an understanding of Smith's limitations, Padilla-Negrete was unlikely to provide the supervision necessary for the children to be safe within the home. While Padilla-Negrete may have had the judgment and skills required to be a good parent, substantial evidence supports the termination court's finding that he could not ensure the safety of his children. Therefore, the Department has demonstrated that there is little likelihood that F. and R. could be returned to their parents in the near future.

*Best Interests of the Children*

Smith and Padilla-Negrete contend that the court prematurely found that termination of their parental rights was in F. and R.'s bests interests. Because the court reached the conclusion that Padilla-Negrete and Smith were unfit, consideration of the children's best interests was proper.

36

Once the Department establishes the elements of RCW 13.34.180(1) by clear, cogent, and convincing evidence, the trial court must determine whether termination of parental rights is in the children's best interests. RCW 13.34.190(1)(b); T.R., 108 Wn. App. at 166-67. It is "'premature'" for the court to address the child's best interests before resolving the issue of parental unfitness through the six statutory elements. In re Welfare of A.B., 168 Wn.2d 908, 925, 232 P.3d 1104 (2010) (quoting In re Welfare of Churape, 43 Wn. App. 634, 639, 719 P.2d 127 (1986)).

Because the Department proved the six statutory elements as required, the trial court's consideration of the children's best interests was not premature. Furthermore, the evidence supports the court's conclusion that termination was in their best interests. F. and R. had already experienced a lengthy dependency. They were living together in a culturally appropriate, Spanish-speaking home that was willing to adopt. As the trial court noted, "The children have waited long enough."[42]

Affirmed.

_Trickey, J_

WE CONCUR:

_Spearman, J._

_Becker, J._

---

[42] CP at 42.