IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | | |
|---|---|---|
| In the Matter of the Dependency of | ) | No. 82421-0-I |
| | ) | (Consolidated with No. 82422-8-I) |
| U.M.R.B. and E.E.B., | ) | |
| | ) | UNPUBLISHED OPINION |
| Minor children. | ) | |

BOWMAN, J. — L.B.[1] appeals the trial court's order terminating his parental rights to his daughters, U.M.R.B. and E.E.B. He argues that the Department of Children, Youth, and Families[2] failed to explore adequately whether he has an intellectual disability and offer him services expressly and understandably. He also argues that the Department did not adequately tailor services to his individual needs. Because several psychological evaluations show L.B. has no intellectual disability, and the record shows the Department adequately tailored L.B.'s services to his academic deficiency, we affirm.

FACTS

E.E.B. and U.M.R.B. are biological sisters, born to mother M.J.[3] and father L.B. E.E.B. was born in March 2015 and U.M.R.B. was born in July 2016.

---

[1] We grant the father's motion to use only his initials throughout the opinion.

[2] Washington State created the Department of Children, Youth, and Families (DCYF) in 2017. DCYF oversees several services previously offered by the Department of Social and Health Services (DSHS). Because DSHS initiated the dependency petitions and DCYF initiated the termination petition, we refer to the agencies collectively as the "Department" throughout the opinion.

[3] This appeal concerns the trial court's termination of only L.B.'s parental rights. M.J. died before the termination hearing.

Citations and pin cites are based on the Westlaw online version of the cited material.

<u>2015 Dependency</u>

E.E.B. immediately became the subject of a dependency petition. At birth, her urine tested positive for cocaine, opiates, and THC,[4] so the Department placed her in protective custody. Two months later, the court entered an agreed order of dependency as to L.B.[5] As part of that dependency, the court ordered L.B. to complete services, including two months of weekly random urinalyses (UAs), an Incredible Years parenting class, a psychological evaluation with a parenting component and any recommended treatment, as well as in-home services after reunification.

In July 2015, licensed clinical psychologist Dr. Michael O'Leary administered L.B.'s psychological and comprehensive parenting evaluation. In his interview with Dr. O'Leary, L.B. reported he was an "average" student in school, though he needed extra help learning to spell during elementary school and had some special education support in high school. He did not graduate from high school but did graduate from a trade school.

Dr. O'Leary tested L.B.'s intellectual ability using the "Wonderlic Personnel Test" (WPT). The WPT measures general mental ability and correlates strongly with the "Wechsler Adult Intelligence Scale" (WAIS), which measures IQ.[6] L.B. scored in the third percentile, a score predictive of an IQ between 68 and 78. While that score would place L.B. in the "borderline range" of intellectual capacity, Dr. O'Leary observed that L.B. had a well developed vocabulary for

---

[4] Tetrahydrocannabinol.

[5] The court entered a default order of dependency as to M.J. three months later.

[6] Intelligence quotient.

someone who did not complete high school, and noted that L.B. "appeared to function within normal limits in terms of his problem-solving and intellectual ability." He concluded that L.B.'s "presentation suggested a higher level of [intellectual] function than was reflected in his WPT scores." Dr. O'Leary did not conclude that L.B. would have trouble understanding offered services or that he required individually tailored services.

Dr. O'Leary also administered emotional and personality testing, which led him to diagnose L.B. with unspecified personality disorder with antisocial, narcissistic, and paranoid elements and an "[a]cademic or educational problem." Based on the personality disorder diagnosis, Dr. O'Leary concluded that L.B. did "not appear to be amenable to treatment." Even so, after nearly two years, L.B. successfully completed his services. So in June 2017, the Department returned E.E.B. to L.B.'s care. The court then dismissed the dependency petition.

2018 Dependencies

In February 2018, Kent police went to L.B.'s home to investigate a report that L.B. assaulted his brother-in-law, the property owner. After entering the home, officers noted "unsafe living conditions," including unfinished "concrete slab" floors, almost no furniture, only one mattress on the floor, piles of garbage and diapers along the walls, and uncapped bottles filled with what appeared to be urine on an end table. The home reeked of raw sewage. A neighbor reported to the officers that the home had no functional plumbing, and they saw L.B. dumping buckets of sewage into a line of trees nearby.

After investigating the assault, officers arrested L.B. Because M.J. had been in custody on unrelated charges since January, the Department placed 3-year-old E.E.B. and 19-month-old U.M.R.B. in protective custody. The Department petitioned for dependency,[7] and the court ordered the children to remain in the Department's custody because of the unsafe and unsanitary living conditions at L.B.'s home.

In April 2018, L.B. pleaded guilty to misdemeanor neglect of a child. As part of his sentence, the court entered a domestic violence (DV) no-contact order, prohibiting L.B. from contacting E.E.B. and U.M.R.B. for three years.

Several days later, the superior court entered a contested order of dependency as to L.B. for both children.[8] The court ordered L.B. to engage in services, including a psychological evaluation with a parenting component and any recommended treatment, a DV evaluation and recommended treatment, and in-home services if the children return to live with L.B. The court recognized that the no-contact order did not allow L.B. to contact the children, so the court ordered the Department to facilitate supervised visitation if it was "rescinded or modified to allow contact."

In May 2018, the Department referred L.B. for a DV evaluation at La Esperanza Health Counseling Services. L.B. completed the evaluation, which recommended a 52-week "trauma-informed cognitive behavioral therapy level 3 domestic violence intervention treatment" program, including both group and

---

[7] E.E.B. and U.M.R.B. had individual dependency cases but a joint termination hearing. L.B. filed separate notices of appeal as to each child, which we consolidated under No. 82421-0-I.

[8] The court also entered a default order of dependency as to M.J.

individual sessions.  The Department also referred L.B. for a psychological evaluation with Dr. Richard Washburn at Clinical and Forensic Psychology.  L.B. did not report for his evaluation until September 2018.  Like Dr. O'Leary in 2015, Dr. Washburn conducted testing to assess L.B.'s mental health, personality, and intellectual capacity.

Sometime after his evaluation with Dr. Washburn, L.B. moved to Las Vegas, and then shortly after, to Houston.  In February 2019, Houston police arrested and jailed L.B. for assaulting M.J.  L.B. pleaded guilty to misdemeanor assault of a family member.

Dr. Washburn issued his report in March 2019.[9]  Dr. Washburn's testing placed L.B.'s intellectual abilities in the low average range.  Dr. Washburn recommended that L.B. undergo a medication assessment and regular UAs, attend individual mental health therapy, attend a DV treatment program, and participate in parenting classes that address nurturing behavior and proper child care, as well as the stages of children's emotional, physical, and psychological development.  The court incorporated the recommendations from La Esperanza and Dr. Washburn into L.B.'s treatment plan.

The Department referred L.B. to local service providers for each of the recommended treatment programs.  L.B. then told the Department for the first time that he was not in Washington.  So Department social worker Marissa McGee updated L.B.'s service letters, referring him to agencies in Houston that

---

[9] Dr. Washburn did not testify at the termination hearing, and his report is not in the record.  Information about Dr. Washburn's report comes from the testimony of L.B., subsequent psychological evaluator Dr. Tatyana Shepel, and Department social worker Marissa McGee.

could provide the necessary services.  After serving his misdemeanor assault sentence, L.B. began his services.

For DV treatment, the Department referred L.B. to an 18-week "Battering Intervention and Prevention Program" (BIPP) run by Aid to Victims of Domestic Abuse.  McGee testified at the termination hearing that she could not find a level 3 program in the Houston area like La Esperanza suggested, and BIPP was the most suitable for L.B.'s needs.  L.B. completed BIPP in August 2019.  He scored well in attendance, engagement, respectful conduct, and sobriety but received low scores in accountability, help seeking, application of skills, and constructive participation.

For UAs, the Department referred L.B. to Houston Medical Testing Services.  But L.B. did not complete any UAs while living in Texas.  For individual counseling and medication management, the Department referred L.B. to the Harris Center for Mental Health, and later, the Ben Taub Hospital and SUN Behavioral Houston.  There is no evidence that L.B. completed those services in Houston.

2019 Petition for Termination of Parental Rights

By August 2019, L.B. had finished only BIPP in Houston.  The no-contact order still restrained him from seeing his daughters, and he had six active warrants for his arrest out of Kent Municipal Court for failing to appear for six different cases.  The Department petitioned to terminate L.B.'s parental rights to E.E.B. and U.M.R.B.,[10] and the court set a fact-finding hearing for December

---

[10] The Department also petitioned to terminate M.J.'s parental rights.

2019.  For various reasons, the court granted both parties' motions to continue the termination hearing several times between December 2019 and December 2020.

<u>Resumption of Services</u>

In October 2019, L.B. returned to Washington State.  The Department issued another service letter, again referring L.B. to local services.  The Department referred L.B. to A Walk to Freedom Counseling and the Crossroads treatment center for UAs, and L.B. completed 90 days of clean UAs.

The Department referred L.B. to Sound Mental Health for his remaining services.  But instead of going to Sound Mental Health, L.B. chose to attend parenting classes and individual mental health therapy with Alicia Ross at Valley Cities Behavioral Health Care.

L.B. also returned to La Esperanza to complete his 52-week level 3 DV treatment.  He received individual therapy there because his DV counselor, Zoila Saritama, conducted the group sessions in Spanish.  But after about 24 weeks of treatment, the contract between the Department and La Esperanza expired.  The Department could not find another level 3 program; so instead, McGee referred L.B. to the state's Social Treatment Opportunity Programs (STOP), which offered a combination of DV treatment and parenting classes.  L.B. completed 12 weeks of treatment at STOP.  L.B. also independently sought additional services from different agencies.  He found and completed an 8-week "[f]ather's support group," and voluntarily enrolled in and completed both an 8-week "positive parenting program" and a 6-week "[p]arent [t]raining [c]ourse."

In February 2020, the court in L.B.'s 2018 child neglect case modified the no-contact orders, permitting him supervised visits with the children. But before L.B. could begin his visits, the COVID-19 pandemic[11] hit, precluding in-person visits. So in March 2020, L.B. began "virtual visit[s]" with the children through a live video chat service. E.E.B. was now 5 years old and U.M.R.B. was 3 years 8 months old, and it had been more than 2 years since the children had contact with L.B.[12]

In August 2020, the Department learned that Dr. Washburn had retired and become unavailable to testify at the termination hearing. As a result, L.B. completed another psychological evaluation with a parenting component, this time with licensed clinical neuropsychologist Dr. Tatyana Shepel. Dr. Shepel administered the WAIS IQ test to assess L.B.'s intellectual capacity and the "Wide Range Achievement Test—Fourth Edition" (WRAT-4) to assess his academic ability, as well as two personality assessment inventories and a parenting inventory.

Dr. Shepel submitted her report in October 2020. Consistent with prior evaluations, the WAIS showed borderline intellectual functioning. L.B.'s working memory and processing speed were borderline and his verbal abilities were low average. Yet based on clinical impressions, Dr. Shepel believed L.B.'s "true intellectual functioning was in the low average range because he was very

---

[11] COVID-19 is the World Health Organization's official name for "coronavirus disease 2019," first discovered in December 2019 in Wuhan, China. COVID-19 is a severe, highly contagious respiratory illness that quickly spread throughout the world.

[12] Visitation stopped a few months later when the children were not in therapy because the pandemic suspended their in-person sessions. After the children resumed their regular therapy, L.B. resumed supervised visitation, but the visits were by phone only.

impulsive and very distractible and inconsistent." The WRAT-4 revealed that L.B. struggled with spelling, and while he showed strength in reading, he was borderline in reading comprehension. According to Dr. Shepel, "[h]e made multiple errors, multiple mistakes" on the tests, "not because he didn't have the knowledge but because he was rushing through and not paying attention to details." She described asking L.B. to slow down multiple times because when he slowed down, he could understand the sentences correctly. Dr. Shepel diagnosed L.B. with "impulse disorder" and a "specific learning disorder with impairment in spelling."

Based on the WRAT-4 results, Dr. Shepel said L.B. might not benefit from treatment in a group setting "when there is a lot of reading material that . . . requires higher than [a] sixth grade level of reading comprehension." She recommended L.B. receive services in a one-on-one format because of his "deficiencies in academic achievement."

Both personality inventories assessed the "same domains of personality functioning." But L.B. produced only one valid test result because he did not answer 25 percent of the questions on the other test. The results of the valid inventory showed L.B. was "similar to people who have severe interpersonal problems, who . . . may disregard [the] opinions and needs of others." Dr. Shepel diagnosed L.B. with "personality disorder with narcissistic, antisocial, histrionic, and paranoid features," just as Dr. O'Leary had in 2015. She noted that typically, people with a diagnosed personality disorder like L.B.'s are highly

defensive, resistant to change, and blame others for their circumstances, so they "attend services superficially."[13]

L.B. continued the same mental health counseling and DV treatment after Dr. Shepel issued her report. While Valley Cities mental health counselor Ross reported L.B. was making improvements, La Esperanza level 3 DV counselor Saritama reported he had little accountability and was resistant to change.

L.B. also continued to have phone-only visits with E.E.B. and U.M.R.B. But by October 2020, both children had such significant behavioral issues after their visits with L.B. that their court-appointed special advocate (CASA), Megan Gee, sought to suspend visits. The trial court granted the CASA's motion and suspended visits in November 2020.

2021 Termination Hearing

In January 2021, the trial court held a six-day termination fact-finding hearing. The court heard testimony from L.B., Valley Cities and La Esperanza service providers Ross and Saritama, visitation supervisors, one of the children's therapists, social worker McGee, CASA Gee, and Dr. Shepel.

At the end of the hearing, the court granted the Department's petition for termination and entered an order, findings of fact, and conclusions of law. The court found that the Department offered and L.B. participated in express and

---

[13] The parenting inventory showed L.B. had "high risk scores" when it came to "parental empathy towards children's needs," developmental expectations of "what children are capable of and what to expect from children's specific ages," and "putting [the] interest of the children above [his] own" interest. Dr. Shepel explained that the parenting inventory was a standardized tool used to assess parenting and child rearing attitude, "but it doesn't have validity scales" like the other tests she administered, so it has limitations. Still, Dr. Shepel believed the parenting inventory is a useful tool when used along with other assessments, behavioral observations, history, and collateral information.

understandable services, but L.B. "failed to substantially improve his parental deficiencies in the 33 months following the entry of the dispositional [dependency] order[s]" in April 2018. It determined that L.B. was unfit to parent the children and that there was little likelihood he would remedy conditions so that the Department could return the children to his care in the near future. Finally, the court found that continuation of the parent-child relationship diminished the children's prospects for early integration into a stable and permanent home,[14] and that termination of L.B.'s parental rights was in the best interest of the children.

L.B. appeals.

ANALYSIS

L.B. argues that substantial evidence does not support the trial court's finding that the Department "expressly and understandably" offered him services necessary to correct his parental deficiencies under RCW 13.34.180(1)(d). He also argues that the Department failed to tailor services to his individual needs. We disagree.[15]

---

[14] Both children were "thriving" and comfortably living in pre-adoptive homes with half siblings.

[15] L.B. also contends that because the Department did not adequately tailor services to his needs, the court prematurely determined that he could not remedy his parental deficiencies in the near future under RCW 13.34.180(1)(e) and that termination was in the children's best interest under RCW 13.34.190(1)(b). Because we conclude the trial court did not err by determining that the Department understandably offered L.B. necessary services tailored to his needs, it was not premature for the court to consider whether L.B. could remedy his parental deficiencies in the near future and whether termination was in the children's best interest.

Likewise, CASA Gee filed a response brief on appeal, arguing that termination was in the best interest of the children. L.B. objects to us considering the brief. While the CASA is not a party on appeal, we have broad discretion to accept briefing under RAP 10.1(h). But because the best interest of the children is not the dispositive issue on appeal, the brief does little to facilitate a decision on the merits. As a result, we decline to consider the CASA's brief.

Parental rights are a fundamental liberty interest protected by the United States Constitution. Santosky v. Kramer, 455 U.S. 745, 753, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982). For a trial court to terminate parental rights, the Department must first prove the six elements of RCW 13.34.180(1)[16] by clear, cogent, and convincing evidence. RCW 13.34.190(1)(a)(i). After proving all six elements of RCW 13.34.180(1) clearly and convincingly, the Department must show by a preponderance of the evidence that termination is in the child's best interest. In re Parental Rights to K.M.M., 186 Wn.2d 466, 479, 379 P.3d 75 (2016); RCW 13.34.190(1)(b).

In reviewing a trial court's decision to terminate parental rights, we are limited to assessing whether substantial evidence supports the trial court's findings. In re Parental Rights to D.H., 195 Wn.2d 710, 718, 464 P.3d 215 (2020). "Substantial evidence" means "evidence in sufficient quantity to persuade a fair-minded, rational person of the truth of the declared premise." In re Welfare of T.B., 150 Wn. App. 599, 607, 209 P.3d 497 (2009). "Because of

---

[16] RCW 13.34.180(1) requires the Department to prove:
 (a) That the child has been found to be a dependent child;
 (b) That the court has entered a dispositional order pursuant to RCW 13.34.130;
 (c) That the child has been removed or will, at the time of the hearing, have been removed from the custody of the parent for a period of at least six months pursuant to a finding of dependency;
 (d) That the services ordered under RCW 13.34.136 have been expressly and understandably offered or provided and all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been expressly and understandably offered or provided;
 (e) That there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future. . . .
 . . . ; and
 (f) That continuation of the parent and child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home.

the highly fact-specific nature of termination proceedings, deference to the trial court is 'particularly important.' " K.M.M., 186 Wn.2d at 477 (quoting In re Welfare of Hall, 99 Wn.2d 842, 849, 664 P.2d 1245 (1983)).

Under RCW 13.34.180(1)(d), the Department must show that it "expressly and understandably" offered all "reasonably available" and "necessary" services capable of correcting a parent's deficiencies within the near future. The Department must individually tailor such services to the needs of the parent. In re Dependency of D.L.B., 188 Wn. App. 905, 920, 355 P.3d 345 (2015), aff'd, 186 Wn.2d 103, 376 P.3d 1099 (2016).

When the Department has reason to believe that a parent may have an intellectual disability, it must make reasonable efforts to learn the extent of the disability and how the disability could interfere with the parent's ability to understand and benefit from the Department's offer of services. In re Termination of Parental Rights to M.A.S.C., 197 Wn.2d 685, 689, 486 P.3d 886 (2021). If the parent has an intellectual disability, the Department "must then tailor its offer of services in accordance with current professional guidelines to ensure that the offer is reasonably understandable to the parent." M.A.S.C., 197 Wn.2d at 689.

L.B. argues that the Department had reason to suspect he had an intellectual disability, but it failed to make reasonable efforts to learn the extent of his disability so that it could offer him services expressly and understandably. He likens his case to M.A.S.C.

In M.A.S.C., the Department removed J.C.'s infant son from her care because of suspected neglect. M.A.S.C., 197 Wn.2d at 689-90. From the outset, the Department had several contacts with J.C. that raised concerns about her " 'lack of cognitive skills to follow through with basic parenting education and the infant's global developmental needs.' " M.A.S.C., 197 Wn.2d at 690. And the Department knew that previous contacts between J.C. and Oregon child welfare authorities suggested that J.C. had " 'impaired fac[u]lties.' " M.A.S.C., 197 Wn.2d at 690.[17] Yet the Department never tried to understand the extent of J.C.'s abilities and limitations. While it recommended J.C. participate in an intellectual disability evaluation, it never obtained a clinical diagnosis or other information about the extent of J.C.'s disability because J.C. did not " 'follow through' " on the social worker's recommendation for " 'a sustained amount of time.' " M.A.S.C., 197 Wn.2d at 701. And while J.C. completed a diagnostic assessment, it assessed only J.C.'s psychiatric and mental health issues, not her intellectual disabilities.[18] M.A.S.C., 197 Wn.2d at 701.

Despite cues that J.C. may have an intellectual disability, the Department in M.A.S.C. sought and obtained an order of dependency that had a long and complex list of 22 "intentions" and services that J.C. had to complete before reunification with her son. 197 Wn.2d at 692-93. Nothing in the dependency

---

[17] Alteration in original.

[18] The M.A.S.C. court defined "intellectual disability" to mean "a condition that begins before age 18, persists throughout the person's life, and causes 'significant limitations in intellectual functioning and adaptive behavior as expressed in conceptual, social and practical adaptive skills.' " 197 Wn.2d at 688 n.2 (quoting THE ARC, PARENTS WITH INTELLECTUAL DISABILITIES (Mar. 1, 2011), https://thearc.org/wp-content/uploads/forchapters/Parents%20 with%20I_DD.pdf).

order explained which items were "services" and which items were "intentions," and there was "no evidence indicating whether or how the difference between intentions and services was explained to J.C." M.A.S.C., 197 Wn.2d at 693. When J.C. struggled to meet the requirements, the Department sought to terminate her parental rights. M.A.S.C., 197 Wn.2d at 696. The trial court ultimately terminated J.C.'s parental rights, finding that the list in the dependency order "expressly and understandably" offered J.C. services. M.A.S.C., 197 Wn.2d at 696.

Our Supreme Court reversed. M.A.S.C., 197 Wn.2d at 689. It concluded that the Department did not satisfy RCW 13.34.180(1)(d) because it had reason to believe J.C. had an intellectual disability, yet failed to make reasonable efforts to learn the extent of her disability and how the disability could interfere with her ability to understand and benefit from the Department's offer of services. M.A.S.C., 197 Wn.2d at 688-89.

Unlike in M.A.S.C., the record here shows that the Department assessed L.B.'s intellectual capacity three times, and none of the assessments revealed an intellectual disability.

In 2015, Dr. O'Leary determined that L.B.'s intellectual ability was within the normal range. Though he received some special education in high school, L.B. attended and graduated from a trade school. And while L.B.'s predictive IQ score of 68 to 78 placed L.B. in the borderline range, Dr. O'Leary observed that those "scores appear to . . . under[ ]estimate" L.B.'s "true intellectual ability" based on L.B.'s clinical presentation. He concluded that L.B. "appeared to

function within normal limits in terms of his problem-solving and intellectual ability." Dr. O'Leary did not diagnose L.B. as intellectually disabled.

Dr. Washburn also administered intellectual testing in 2018. While Dr. Washburn's report is not in the record, other evidence shows Dr. Washburn's testing placed L.B.'s intellectual abilities in the low average range. Dr. Washburn did not identify or diagnose any intellectual disability.

And Dr. Shepel's 2020 assessment tracked the evaluations of Dr. O'Leary and Dr. Washburn. Dr. Shepel's testing showed L.B. had borderline intellectual functioning. L.B.'s working memory and processing speed were borderline and his verbal abilities were low average, but he particularly struggled with spelling. Still, based on clinical impressions, Dr. Shepel believed L.B.'s "true intellectual functioning was in the low average range because he was very impulsive and very distractible and inconsistent." L.B. made multiple mistakes on the tests, "not because he didn't have the knowledge but because he was rushing through and not paying attention to details." Dr. Shepel reminded L.B. to slow down multiple times because "when he slowed down, he was able to understand the sentencing correctly." Dr. Shepel identified a specific spelling learning disorder but no intellectual disability.

We conclude that unlike in M.A.S.C., the Department here made reasonable efforts to determine whether L.B. had an intellectual disability that could interfere with his ability to understand and benefit from offered services. L.B. underwent three independent psychological evaluations with testing for intellectual capacity. Each assessment determined he has no intellectual

disability, and none raised concerns about L.B.'s ability to understand and benefit from the Department's offered services. Further, the record shows that L.B. often communicated with his social worker and readily understood both the Department's offer of services and how to access them. Indeed, he enrolled in each of the recommended services, successfully completed most of them,[19] and sought and completed additional services on his own.

In the alternative, L.B. argues, "[T]here is no evidence the Department actually provided services tailored" to meet the academic challenges identified by Dr. Shepel. Specifically, based on L.B.'s "deficiencies in academic achievement," Dr. Shepel testified that L.B. might not benefit from group-format treatment when "there is a lot of reading material that . . . requires higher than [a] sixth grade level of reading comprehension." As a result, she recommended L.B. receive services in a one-on-one format.[20]

L.B. contends the Department failed to tailor his services adequately because BIPP in Houston offered only group-format DV treatment. While it is true that L.B.'s 18 weeks at BIPP was not one-on-one, he ignores that he also received at least 24 weeks of individual DV treatment at La Esperanza. Treatment provider Saritama testified that while she typically teaches groups, she

---

[19] L.B. accessed and completed all services except the full 52 weeks of level 3 DV treatment.

[20] L.B. suggests the Department should have investigated further to determine the extent of any cognitive disability. But the academic issues identified resulted from extensive testing three times by three different qualified professionals, and no one diagnosed L.B. as intellectually disabled. Instead, the evaluators recognized L.B.'s academic challenges, and then recommended services that would adequately compensate for his needs. Specifically, Dr. Washburn and Dr. Shepel tailored their recommendations to individual treatment sessions. While Dr. O'Leary did not recommend one-on-one services in 2015, we note that L.B. was still able to complete all necessary services successfully, leading to the dismissal of the 2015 dependency of E.E.B.

always met with L.B. individually.[21]  He also received over a year of individual mental health counselling at Valley Cities.  His therapist Ross testified that she provided L.B. one-on-one mental health therapy and cognitive behavioral therapy.  The record shows that L.B. received adequately tailored services to accommodate his academic deficiencies.[22]

Still, L.B. argues that his inability to gain insight from his services or improve his parenting deficiencies must flow from an undiagnosed intellectual disability or a failure to tailor services adequately.  But L.B.'s argument discounts the role his personality disorder plays in his amenability to treatment.

Dr. O'Leary diagnosed L.B. with "Unspecified Personality Disorder with antisocial, narcissistic and paranoid elements" and an "[a]cademic or educational problem."  Based on his diagnoses, Dr. O'Leary concluded that L.B. "does not appear to be amenable to treatment."

Dr. Shepel also diagnosed L.B. with "personality disorder with narcissistic, antisocial, histrionic, and paranoid features."  Dr. Shepel noted that people "with this severe personality disorder" are typically "highly resistant to change" and blame others for their circumstances, so they "attend services superficially."  She described people with L.B.'s personality profile as having "very poor psychological insight" and an "inability to understand how one's behavior affects

---

[21] The record also shows that L.B. attended 12 weeks of DV treatment at STOP.  Though the record is unclear about the format of that treatment, L.B. completed that program, and he makes no argument that he received inadequately tailored treatment at STOP.

[22] L.B. argues that the Department did not adequately tailor those services because neither Saritama nor Ross testified that they tailored their treatment and instruction to meet his "particular intellectual disability" needs.  But nothing in Dr. Shepel's evaluation recommended tailoring beyond one-on-one services to aid L.B.'s deficiencies in academic achievement.

others," they are "resistant to change," and they have a "very high level of denial" and "defensiveness."

L.B. acknowledges that his personality disorder may have contributed to his lack of insight and accountability but argues that it is "equally plausible that his intellectual disability hamstrung his ability to make progress."  But it is not our role to weigh and evaluate conflicting or "plausible" evidence.  See Prostov v. Dep't of Licensing, 186 Wn. App. 795, 819, 349 P.3d 874 (2015).  When the trial court has weighed the evidence, our review is limited to determining whether substantial evidence supports the trial court's findings.  Prostov, 186 Wn. App. at 819.  And here, substantial evidence supports the trial court's finding that L.B.'s inability to gain insight from his services is attributable to his personality disorder.

We conclude substantial evidence supports the trial court's determination that the Department offered express and understandable services tailored to L.B.'s individual needs, and affirm the order terminating L.B.'s parental rights to E.E.B. and U.M.R.B.

_____
Brennan, J.

WE CONCUR:

_____        _____
Mann, C.J.                                             Appelwick, J.

19